# EXHIBIT APR-14

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 1 of 46        [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

| | |
|---|---|
| **STATE OF MINNESOTA** | **DISTRICT COURT** |
| **COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT** |

| | |
|---|---|
| State of Minnesota, | Court File No. : 27-CR-23-1886 |
| Plaintiff, | |
| vs. | **DEFENDANT'S MOTION TO SUBMIT EVIDENCE EXHIBITS B, AND C INTO THE OFFICIAL RECORD** |
| Matthew David Guertin, | |
| Defendant. | Judicial Officer: Sarah Hudelston |

TO:    THE HONORABLE SARAH HUDELSTON, JUDGE OF DISTRICT COURT;
       MARY F. MORIARTY, HENNEPIN COUNTY ATTORNEY; AND MAWERDI
       AHMED HAMID, ASSISTANT HENNEPIN COUNTY ATTORNEY

## I.   INTRODUCTION

The Defendant, Matthew Guertin, proceeding pro se for this motion while represented by counsel, respectfully moves this Court to admit into the record two additional evidence exhibits: Exhibit B and Exhibit C, each of which contains material evidence related to the targeted misappropriation of the Defendant's patented technology, the falsification of federal intellectual property records, and the subsequent institutional cover-up now at the heart of this case.

These exhibits directly support the factual foundation established in Exhibit A (*Netflix Whistleblower is Found Alive and Well – Part 1*), and together they form a cohesive, documented, and publicly verifiable sequence of fraud that not only contextualizes the Defendant's continued advocacy—but dismantles the myth that his claims are somehow detached from reality.

## II.   LEGAL BASIS FOR SUBMISSION

Pursuant to the Defendant's rights under the Sixth and Fourteenth Amendments of the U.S. Constitution, and Minnesota Rules of Evidence 401 through 403, the Defendant is

1

**EXHIBIT APR-14 | p. 1**

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 2 of 46       [ source file ]       [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

entitled to introduce into the record all relevant and non-prejudicial evidence that bears
directly on:

1.  The credibility of mental health assessments filed against him;

2.  The factual legitimacy of his intellectual property claims; and

3.  The broader motive and backdrop behind his prosecution and continued targeting.

Both Exhibits B and C are:

- **Relevant:** These documents speak to the central question of whether the
  Defendant's claims of IP theft and fraudulent legal interference were grounded in
  fact. They are.

- **Material:** The contents directly contradict the alleged basis for labeling the
  Defendant "psychotic," "delusional," or otherwise impaired.

- **Authenticated:** The documents were prepared using established forensic
  techniques and contain citations to publicly available federal patent filings and
  metadata records.

### III.   FACTUAL OVERVIEW OF EXHIBITS

**Exhibit B - Brodsky Patent Fraud Presentation**

A comprehensive legal analysis detailing the strategic claim amendments,
suspicious timeline gaps, and surveillance activity surrounding U.S. Patent No.
11,383,062 (the Brodsky Patent). This report presents a clear case of retroactive
claim construction designed to undermine the novelty and scope of the
Defendant's earlier-filed invention. It highlights LinkedIn surveillance patterns,
interference timing, and USPTO manipulation that point toward insider access and
covert coordination.

2

**EXHIBIT APR-14 | p. 2**

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 3 of 46        [ source file ]        [ .ots timestamp of source file ]

---

<div align="center">27-CR-23-1886</div>

<div align="right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:30 AM</div>

**Exhibit C - Brodsky Patent Forensic Analysis**

A technical breakdown that exposes artificial pixel tiling artifacts - consistent with AI generation or synthetic document alteration - embedded in the USPTO-submitted Image File Wrapper materials associated with the Brodsky patent. The report presents 16x16 tiling patterns, file-level anomalies, and digital fingerprints that do not match any known USPTO-generated outputs. It also documents misfiled interview summaries and irregular metadata timelines, supporting the conclusion of systematic deception.

These exhibits do not raise questions - they answer them. They prove the very fraud that the Defendant has been gaslit and criminalized for exposing.

<div align="center">

**IV.   RELIEF SOUGHT**

</div>

The Defendant respectfully requests that this Court:

1. Admit into the official record:

   - **Exhibit B** - Brodsky Patent Fraud Presentation

   - **Exhibit C** - Brodsky Patent Forensic Analysis

2. Acknowledge their relevance to the Defendant's defense, and specifically to the question of whether his claims of corporate patent theft and government collusion are rooted in evidence or illness.

<div align="center">

**V.   CONCLUSION**

</div>

These exhibits are not optional. They are not speculative. They are not emotional. They are hard forensic reality - and they document the very events that have been conveniently omitted, denied, or dismissed by parties now scrambling to preserve their own reputations. To pretend they are irrelevant is to deny the most basic premise of justice: that truth matters, even when it's inconvenient.

<div align="center">3</div>

---

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<div align="right">**EXHIBIT APR-14 | p. 3**</div>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 4 of 46        [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

<div align="right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:30 AM</div>

The Court is now in possession not only of the whistleblower's story (Exhibit A) - but also the forensic circuitry that powers it. Exhibits B and C do more than support the narrative - they map the mechanics of the fraud itself.

They expose the machine.

And in doing so, they expose the U.S. Patent and Trademark system for what it has become: a weaponized infrastructure, engineered not to protect innovation, but to usurp it - through advanced AI manipulation, strategic surveillance, and institutional protocols designed to retroactively rewrite digital history on demand.

Dated:  April 14, 2025                    Respectfully submitted,

                                         /s/ Matthew D. Guertin

                                        Matthew David Guertin
                                        Defendant Pro Se
                                        4385 Trenton Ln. N 202
                                        Plymouth, MN  55442
                                        Telephone: 763-221-4540
                                        MattGuertin@protonmail.com
                                        www.MattGuertin.com

4

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**EXHIBIT APR-14 | p. 4**

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 5 of 46        [ source file ]        [ .ots timestamp of source file ]

# US Patent 11,383,062 | High Level Patent Fraud Presentation

---

## 1 | Executive Summary

This report provides a comprehensive analysis of the alleged high-level fraud in the Brodsky patent (US 11,383,062) by systematically comparing its disclosures, claim amendments, and filing history against InfiniSet Inc.'s clearly enabled patent (US 11,577,177) for a motorized, rotatable treadmill system designed for immersive virtual environments. InfiniSet's patent is distinguished by innovative features such as a proprietary pancake slip ring for uninterrupted power and data transfer, an endless-loop belt mechanism that enables omnidirectional locomotion, and precise control systems that integrate advanced sensor arrays with AI-driven feedback. These components are detailed in technical drawings and clear mechanical descriptions.

In contrast, the Brodsky patent has evolved through significant claim amendments introduced after InfiniSet's confidential provisional filing (March 19, 2021) but prior to its public disclosure. The amendments incorporate elements - including an "omnidirectional treadmill" and locomotion support systems - that closely mirror InfiniSet's core innovations. However, Brodsky's disclosure is plagued by ambiguous, overly broad terminology; for instance, the term "omnidirectional treadmill" is used to describe multiple, mutually exclusive embodiments (passive, active, and dynamic) without clear demarcation, thereby creating uncertainty regarding the scope and enforceability of the claims.

Critical timeline anomalies further amplify these concerns. Notably, both patents share the same publication date (September 22, 2022) - a statistically improbable occurrence given the confidentiality maintained until publication. This synchronization, combined with retroactive claim amendments, suggests that Brodsky's applicants modified their claims with insider knowledge of InfiniSet's technology.

Moreover, additional timeline and corporate evidence reveal a disturbing pattern: just 12 days after InfiniSet's provisional filing on March 19, 2021, Stephan Trojansky filed a duplicate patent application - suggesting an unprecedented breach of confidentiality. Further compounding the irregularity, Brodsky's continuation filing was strategically timed on June 8, 2022, occurring just before InfiniSet's PCT search was completed by KIPO. Digital evidence from Guertin's authenticated LinkedIn search graph shows significant spikes on his dormant profile by entities linked to Netflix, strongly implying that confidential InfiniSet filing data was rapidly disseminated - possibly through breaches within USPTO channels.

Adding to this troubling sequence, on May 20, 2022, Netflix announced a $100 million investment in South Korea to set up specialized visual effects facilities. In a high-profile ceremony reported by The Korea Times, Scanline VFX head Stephan Trojansky was photographed alongside Korea Trade-Investment Promotion Agency (KOTRA) President Yu Jeong-yeol and Trade Minister Ahn Duk-geun. This strategic corporate maneuver - timed mere days before Brodsky's continuation filing - not only bolstered the financial clout behind competing patent efforts but also appears designed to influence local patent examiners in the region where InfiniSet's PCT search was conducted. These coordinated events, when coupled with Netflix's subsequent patent grant, underscore the alarming likelihood that multiple

<span style="color:red">Exhibit B |  p. 1</span>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 6 of 46        [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

parties (including Brodsky, Trojansky, and Netflix) orchestrated their actions to appropriate and preempt InfiniSet's pioneering technology.

Technical and mechanical inconsistencies in Brodsky's disclosure - such as conflicting embodiments of the treadmill system, impractical harness configurations, and inadequate power distribution details - further compromise the enablement of the invention. Procedural irregularities, including the absence of the referenced Israeli priority document (IL265092A) and apparent examiner oversight, exacerbate these issues.

An integrated forensic analysis of the patent drawings reveals that while the images are algorithmically generated using digital design tools, they have been deliberately post-processed to mimic the appearance of scanned drawings. This intentional simulation of scan artifacts - characterized by subtle edge degradations and artificial background textures - adds an additional layer of obfuscation to the disclosure, reinforcing concerns regarding the overall clarity and authenticity of the invention.

In summary, the cumulative evidence demonstrates that the Brodsky patent was not the result of an independent inventive process but rather a deliberate, strategic - and potentially fraudulent - attempt to capture InfiniSet's groundbreaking technology. To protect its intellectual property and market position, it is imperative that InfiniSet pursues aggressive legal challenges (including post-grant and inter partes reviews), strengthens its own patent claims, and advocates for enhanced oversight and regulatory reform at the USPTO. These actions are essential not only for preserving InfiniSet's competitive edge but also for maintaining the integrity of the patent system as a whole.

## 2 | Introduction

This report presents a comprehensive analysis of the fraudulent and ambiguous elements found in the Brodsky patent (US 11,383,062) by systematically comparing its disclosures, claim amendments, and filing history with InfiniSet Inc.'s clearly enabled patent (US 11,577,177) for a groundbreaking motorized, rotatable treadmill system designed for immersive virtual environments. InfiniSet's patent is distinguished by its innovative features - including a proprietary pancake slip ring that enables continuous, uninterrupted power and data transfer during full 360° rotations; an endless-loop belt mechanism that provides unobstructed, omnidirectional locomotion; and precise control systems that integrate advanced sensor arrays with AI-driven feedback. These components are described in extensive technical detail and supported by clear, reproducible drawings.

In contrast, the Brodsky patent has evolved through significant claim amendments introduced after InfiniSet's confidential provisional filing (March 19, 2021) but prior to its public disclosure. These amendments incorporate elements such as an "omnidirectional treadmill" and locomotion support systems that closely mirror InfiniSet's core innovations. However, the Brodsky disclosure is marred by ambiguous and overly broad terminology - for instance, the term "omnidirectional treadmill" is used to describe multiple, mutually exclusive embodiments (passive, active, and dynamic) without clear demarcation - thereby creating uncertainty over the scope and enforceability of its claims.

Furthermore, critical timeline anomalies and corporate events underscore the suspicion of deliberate fraud. Both patents were published on September 22, 2022 - a statistically improbable alignment given

Exhibit B |  p. 2

EXHIBIT APR-14 | p. 6

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 7 of 46        [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

the typical 18-month confidentiality period. Additionally, within just 12 days of InfiniSet's provisional filing, Stephan Trojansky filed a duplicate patent application, and later, Brodsky's continuation filing on June 8, 2022, was timed to coincide with InfiniSet's imminent PCT search by the Korean Intellectual Property Office (KIPO). Digitally authenticated evidence from Matthew Guertin's LinkedIn search graph reveals significant spikes in searches on his dormant profile by entities connected to Netflix, suggesting that confidential filing data was rapidly disseminated - possibly via breaches in USPTO confidentiality protocols. Moreover, Netflix's acquisition of Trojansky's companies and a subsequent $100 million deal in South Korea appear strategically timed to influence local patent examiners in the same region where InfiniSet's PCT search was conducted.

Through a methodical review of timelines, technical specifications, and patent claim language, this report demonstrates that the Brodsky patent is not the product of independent invention but rather a deliberate, strategically fraudulent attempt to appropriate and preempt InfiniSet's pioneering technology. The evidence calls for aggressive legal challenges, enhanced oversight of the patent examination process, and robust measures to protect InfiniSet's intellectual property and market position.

---

## 3 | Background and Context

InfiniSet Inc. holds US Patent 11,577,177, which discloses a revolutionary system for creating immersive virtual environments through a motorized, rotatable treadmill. InfiniSet's patent is characterized by its innovative and clearly defined technical components.

### 3.1 InfiniSet's Patent Overview

- **Proprietary Pancake Slip Ring:**
  This unique component enables continuous, uninterrupted power and data transfer during full 360° rotations, eliminating cable tangling and ensuring seamless operation.

- **Endless-Loop Belt Mechanism:**
  This mechanism supports unobstructed, omnidirectional locomotion, allowing users to move freely in any direction within a virtual space.

- **Precise Control and Tracking Systems:**
  By integrating advanced sensor arrays and AI-driven feedback, the system's control mechanisms adjust the treadmill's rotation and belt movement in real time.

  These elements are supported by detailed mechanical designs and explicit technical drawings, establishing a robust and reproducible foundation for InfiniSet's invention.

---

### 3.2 Brodsky Patent Overview

In contrast, the Brodsky patent (US 11,383,062) exhibits a markedly different developmental history. Originally focused on a gravity simulation system involving a user receiving device and a force applying unit, Brodsky's application later underwent significant claim amendments that introduced new elements such as:

<span style="color:red">Exhibit B |  p. 3</span>

<span style="color:red">**EXHIBIT APR-14 | p. 7**</span>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 8 of 46        [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

- **Omnidirectional Treadmill Integration:**
  Now featuring a treadmill belt mechanism that mirrors InfiniSet's endless-loop belt.

- **Locomotion Support Systems:**
  Incorporating systems to support multidirectional movement that closely resemble those in InfiniSet's design.

- **Immersive Visual Stimulation Systems:**
  Intended to enhance the virtual environment experience, echoing the immersive intent of InfiniSet's original invention.

  These amendments were introduced after InfiniSet's confidential provisional filing but before its public disclosure. Moreover, Brodsky's disclosure is marked by ambiguous and overly broad terminology; for example, the term "omnidirectional treadmill" is applied to multiple, mutually exclusive embodiments (passive, active, and dynamic) without clear demarcation. This lack of specificity obscures the intended technological solution and contrasts sharply with the precise, detailed disclosure provided by InfiniSet.

---

### 3.3 Relevant Filing and Publication Timelines

The timelines associated with these patents are critical to understanding the context of the claim amendments and the allegations of fraud:

#### InfiniSet Patent Timeline:

- **Provisional Filing: March 19, 2021**
  InfiniSet's innovation was first protected in a provisional application that laid the groundwork for its detailed mechanical design.

- **Official Publication and Grant:**
  Following the provisional filing, the application progressed through the standard review process and was eventually granted, solidifying InfiniSet's claim to its proprietary technology.

#### Brodsky Patent Timeline:

- **Original Filing:**
  Brodsky's initial application (filed in 2016) laid a different technological groundwork, focused on gravity simulation.

- **Claim Amendments and Continuation Filing:**
  Subsequent filings and claim amendments shifted the focus to include omnidirectional treadmill integration and locomotion support systems. Crucially, these amendments occurred *after* InfiniSet's provisional filing but *before* its official publication.

- **Synchronized Publication:**
  Both patents were published on September 22, 2022. This synchronization is statistically improbable unless Brodsky had prior knowledge of InfiniSet's confidential application, suggesting potential preemptive strategic alterations to Brodsky's claims.

<span style="color:red">Exhibit B |  p. 4</span>

---

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069

Page: 9 of 46        [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

The juxtaposition of these timelines is central to the fraud allegations. The fact that Brodsky's claim amendments occurred in close temporal proximity to InfiniSet's confidential filing - and that both patents share the same publication date - indicates that the revised Brodsky claims may have been engineered to directly overlap with and undermine InfiniSet's technological territory.

---

## 4 | Timeline Anomalies and Publication Date Synchronization

A critical element in our analysis is the unusual alignment of key filing and publication dates between the two patents:

### Synchronized Publication Dates:
Both InfiniSet's and Brodsky's patents were published on **September 22, 2022**. Given that patent applications are typically confidential until publication (usually 18 months post-filing), this exact date alignment is statistically unlikely unless Brodsky had prior knowledge of InfiniSet's confidential application.

### Timing of Claim Amendments:
Brodsky's continuation claims - specifically those integrating an omnidirectional treadmill and locomotion support systems - were amended *after* InfiniSet's provisional filing (March 19, 2021) but *before* InfiniSet's official publication. This sequence of events strongly suggests that Brodsky's applicants may have adjusted their claims with insider awareness of InfiniSet's innovations.

These timeline anomalies are not only highly irregular but also serve as significant red flags, indicating that the changes in Brodsky's claims may have been strategically engineered to preempt and potentially undermine InfiniSet's technological advancements.

---

## 5 | Strategic Claim Amendments Targeting InfiniSet's Innovations

The updated claims in Brodsky's continuation application demonstrate a clear shift toward technical territory that closely mirrors the core innovations disclosed by InfiniSet. In particular, the amended claims incorporate several elements that align with InfiniSet's well-documented motorized, rotatable treadmill system and its supporting mechanisms. The following points detail exactly how Brodsky's new claims target and overlap with InfiniSet's technology (see Section 8 for additional evidence of fraud):

### 5.1 Integration of an Omnidirectional Treadmill

### Endless-Loop Belt and Locomotion Support:
InfiniSet's patent is centered on a motorized rotatable treadmill that employs an endless-loop belt mechanism to allow a user to walk or run in any direction while remaining stationary. The system's precise synchronization between the treadmill belt, turntable rotation, and camera movement is a key innovation.

<span style="color:red">Exhibit B |  p. 5</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 10 of 46        [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

- **Brodsky's Updated Claims:**
  Brodsky's revised claims now explicitly reference a "locomotion support device" that may encompass a treadmill, omnidirectional treadmill, or stepper. This language is intended to cover mechanisms that provide multidirectional movement support - essentially an endless-loop belt or equivalent - that directly parallels InfiniSet's endless belt design. (See Section 8.2 for evidence of retroactive claim amendments.)

- **Alignment:**
  By introducing a claim element that covers "an omnidirectional treadmill," Brodsky appears to target the same technical solution used by InfiniSet for enabling unlimited directional movement. The inclusion of such a device in the claims is not incidental; it mirrors the core function of InfiniSet's system, thereby suggesting an attempt to preemptively capture the innovative endless-loop belt mechanism.

## 5.2 Immersive Visual Stimulation Systems

### Digital Environment and Immersive Experience:

InfiniSet's patent details a system designed for virtual film production, where the treadmill is used in conjunction with LED or green screen film sets. The design ensures that the camera and treadmill are synchronized to create the illusion of continuous movement within a digital environment. Key to this functionality is the integration of visual feedback that enhances the immersive experience.

- **Brodsky's Updated Claims:**
  The amended Brodsky claims introduce a "visual stimulation system" as one of the multiple subsystems of its Multisensory Simulation System (MSS). This element is positioned as integral to the overall system, suggesting that visual cues are synchronized with the locomotion support (i.e., the omnidirectional treadmill) to simulate an immersive virtual environment. (See Section 10.2 for further evidence regarding synchronized publication dates.)

- **Alignment:**
  The strategic addition of a visual stimulation component in Brodsky's claims aligns with InfiniSet's approach of using visual elements (such as LED backgrounds and digital overlays) to enhance the simulation of movement. This mirroring of immersive features further blurs the line between the two systems, reinforcing the notion that Brodsky's amendments are crafted to overlap with InfiniSet's technology.

## 5.3 Multidirectional Movement and System Control

### Precise Synchronization and Control:

InfiniSet's invention is underpinned by a detailed control system that synchronizes the treadmill's belt speed, turntable rotation, and camera movement. This precise coordination is essential for creating the illusion of seamless, multidirectional movement, and is supported by a robust communication bus and slip ring mechanism that enable continuous, untethered operation.

Exhibit B |  p. 6

---

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File: 5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 11 of 46          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

- **Brodsky's Updated Claims:**
  The new claims in Brodsky's application emphasize a system capable of "multidirectional movement," where the user can move in 360 degrees and in multiple degrees of freedom (both angular and linear). Although Brodsky's disclosure suffers from ambiguous definitions - using the term "omnidirectional treadmill" to refer to potentially different embodiments - the inclusion of such language indicates a deliberate attempt to cover the same operational domain as InfiniSet. (See Section 6 for additional discussion on ambiguous terminology)

- **Alignment:**
  By claiming a system that supports complex, multidirectional locomotion, Brodsky directly overlaps with InfiniSet's fundamental innovation. The language in Brodsky's claims is structured to encompass both passive (e.g., static, bowl-like surfaces) and active (e.g., motorized treadmill belts) embodiments. This dual assignment, however, appears to be a tactic to broadly capture any technology enabling the simulation of natural gait and continuous movement - precisely the area where InfiniSet's detailed mechanical design stands apart.

### 5.4 Implicit Incorporation of Supportive Infrastructure

#### Communication and Continuous Operation:

InfiniSet's system leverages a unique "pancake slip ring" mechanism that facilitates uninterrupted power and data transfer across continuously rotating components. This is an essential detail that enables the treadmill to function without the constraints of cable tangling or mechanical interruptions.

- **Brodsky's Updated Claims:**
  Although Brodsky's claims do not explicitly detail the use of a slip ring, they reference elements such as a "communication bus" and a broadly defined "force applying unit" that is responsible for controlling multiple subsystems. The overall structure of these claims suggests an infrastructure capable of supporting continuous operation, much like the integrated slip ring and power management in InfiniSet's system.

- **Alignment:**
  This implicit inclusion of continuous operation and control infrastructure in Brodsky's claims is another strategic move to align their disclosure with InfiniSet's innovations. By crafting claims that imply a similar level of system integration, Brodsky strengthens its position to potentially cover the same technical ground as InfiniSet.

<span style="color:red">Exhibit B | p. 7</span>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 12 of 46        [ source file ]        [ .ots timestamp of source file ]

---

## 5.5 Summary of Alignment

In summary, the strategic claim amendments in Brodsky's updated continuation application closely align with InfiniSet's technology in the following ways:

- **Replication of the Endless-Loop Belt Mechanism:**
Brodsky's inclusion of an "omnidirectional treadmill" or "locomotion support device" directly targets the endless-loop belt mechanism that is central to InfiniSet's patent.

- **Emphasis on Immersive Visual and Multidirectional Control:**
The addition of a "visual stimulation system" and claims for multidirectional movement are designed to simulate the immersive environment that InfiniSet creates through its integration with digital film sets and precise movement synchronization.

- **Broad, Yet Implicit, Infrastructure for Continuous Operation:**
The language used in Brodsky's claims suggests a system with continuous power and data management capabilities, echoing the operational benefits provided by InfiniSet's patented slip ring and control systems.

Together, these amendments indicate that the updated Brodsky claims are not merely a coincidental overlap but appear to be a deliberate effort to capture and preempt the innovative technology originally developed by InfiniSet. This strategic realignment of claims poses significant implications for the originality and enforceability of both patents, and it forms a cornerstone of the fraud allegations detailed in this report.

---

# 6 | Ambiguities in Terminology and Blurred Definitions

A critical weakness in Brodsky's patent disclosure is the use of ambiguous and overly broad terminology that fails to clearly distinguish between distinct technological embodiments. In contrast, InfiniSet's patent provides precise definitions and detailed descriptions of its components, leaving little room for misinterpretation. The following points illustrate the key areas of ambiguity in the Brodsky patent, incorporating knowledge gleaned from both patents.

## 6.1 Dual Definitions of "Omnidirectional Treadmill" (ODT)

**Multiple Embodiments Under a Single Label:**
Brodsky's disclosure uses the term "Omnidirectional Treadmill" (ODT) to refer simultaneously to:

- **Passive ODT:** A static, low-friction, bowl-like surface designed for free movement.

- **Active ODT:** A motorized treadmill belt assembly with yaw rotation that mimics traditional treadmill operation.

- **Dynamic ODT:** A shape-shifting surface controlled by actuators to alter shape, texture, and friction in real time.

<span style="color:red">Exhibit B |  p. 8</span>

<span style="color:red">EXHIBIT APR-14 | p. 12</span>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 13 of 46        [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

This "dual assignment" (or triple, in this case) violates the definiteness requirement under 35 U.S.C. § 112, as it prevents a competitor - or even a court - from discerning the precise scope of what is claimed.

**Implications:**
Using a single term to cover fundamentally different technologies introduces significant uncertainty in claim interpretation. Without a clear demarcation of which embodiment is intended, it becomes difficult to assess infringement or validity, and it potentially overreaches by attempting to blanket multiple technologies under one label.

---

## 6.2 Ambiguity in "Force Applying Unit" and "Gravity Simulation System"

- **Inconsistent Definitions:**
Brodsky's patent ambiguously describes its "force applying unit" or "gravity simulation system." The disclosure alternates among descriptions of fixed, mobile, or even platform-based embodiments without clarifying which configuration is intended or how these disparate systems operate together.

- **Contrast with InfiniSet:**
InfiniSet's patent, by contrast, provides clear, detailed descriptions of its motorized rotatable treadmill assembly - including precise mechanical components such as a travel deck supporting an endless belt, a rotatable turntable, and a "pancake slip ring" for continuous power and data transfer. This clarity underscores the technical distinctiveness of InfiniSet's invention, which is not matched by the broad and vague descriptions in Brodsky's disclosure.

---

## 6.3 Overly Broad and Generic Terminology

- **Generic Terms with Multiple Meanings:**
In addition to "ODT" and "force applying unit," Brodsky employs generic terms like "locomotion support device," "user receiving device," and "communication bus" without sufficient detail. Such language can encompass a wide array of prior art technologies and may mask a lack of true innovation. For example, while InfiniSet's patent specifies a system for digital isolation via a monochrome surface and details the mechanics of synchronized movement, Brodsky's language is generic enough to cover any system that supports user movement.

- **Consequences for Claim Definiteness:**
The use of broadly defined terms renders the claims indefinite, as competitors cannot readily ascertain which specific embodiments are covered. This ambiguity undermines the enforceability of the claims and raises concerns about whether they satisfy statutory clarity requirements.

Exhibit B |  p. 9

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 14 of 46        [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

## 6.4 Contrast with InfiniSet's Detailed Disclosure

- **Precise Mechanical Descriptions in InfiniSet:**

  InfiniSet's patent is replete with detailed descriptions and clear drawings that explain the functionality of each component. For example, it delineates the structure and operation of the endless-loop belt, the rotational mechanics of the turntable, and the implementation of the slip ring that ensures uninterrupted power and data transfer.

- **Lack of Specificity in Brodsky:**
  By comparison, Brodsky's application relies on broad, catch-all language. The term "omnidirectional treadmill" is applied to multiple, sometimes conflicting, embodiments without the benefit of accompanying specific technical disclosure. This disparity suggests that while InfiniSet's invention is based on a well-defined, innovative mechanical design, Brodsky's claims attempt to cover a much broader technological space in a vague manner.

## 6.5 Summary of Implications

The ambiguous terminology and blurred definitions in Brodsky's patent have significant implications:

- **Uncertainty in Scope:**
  The multiple meanings assigned to key terms such as "ODT" and "force applying unit" make it difficult for practitioners and courts to determine the precise scope of the claims.

- **Risk of Overbreadth:**
  Broad, generic language may unjustifiably capture pre-existing technologies, thereby undermining the novelty and non-obviousness required for patentability.

- **Contrast with Competitor's Clarity:**
  InfiniSet's detailed and specific disclosure highlights the technical merit of its invention and emphasizes the deficiencies in Brodsky's filing, supporting allegations of strategic ambiguity aimed at preempting InfiniSet's innovations.

  In summary, the use of ambiguous and broadly defined terminology in Brodsky's patent not only creates legal and interpretative challenges but also weakens the overall technological disclosure. This ambiguity suggests an intentional strategy to cover a wide technological field - one that directly overlaps with InfiniSet's pioneering work.

## 7 | Technical and Mechanical Inconsistencies

A detailed examination of the mechanical and structural disclosures in the two patents reveals significant inconsistencies in the Brodsky patent when compared to the robust, well-documented design found in the InfiniSet patent.

Exhibit B |  p. 10

**EXHIBIT APR-14 | p. 14**

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File: 5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 15 of 46          [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

## 7.1 Discrepancies in the Design of the Omnidirectional Treadmill (ODT)

- **InfiniSet's Detailed Mechanical Architecture:**
  InfiniSet's patent provides a clear and precise description of a motorized rotatable treadmill assembly. Its design includes a travel deck supporting an endless-loop belt, a rotatable turntable, and a specialized "pancake slip ring" that ensures uninterrupted power and data transfer even during full 360° rotations. The system's components are meticulously illustrated, with detailed drawings that depict how the belt, turntable, and control systems work in unison to create a seamless illusion of movement within a virtual environment.

- **Brodsky's Conflicting Embodiments:**
  In contrast, the Brodsky patent employs the term "omnidirectional treadmill" to describe multiple, mutually exclusive embodiments:

  - A **passive version** that suggests a static, bowl-like surface designed for friction-based movement.

  - An **active version** involving a linear treadmill belt mounted on a rotatable platform.

  - A **dynamic version** where the surface is purportedly shape-shifting via actuators. This multiplicity of definitions creates an inherent contradiction. For example, drawings in the Brodsky patent illustrate configurations where large, forklift-like arms are shown alongside the treadmill belt - elements that, from an engineering standpoint, would obstruct the intended rotational movement. Additionally, there is an absence of clear mechanisms for cable management (e.g., a proper slip ring), which is critical for continuous rotation without tangling power and data lines.

---

## 7.2 Inconsistencies in Harness and Power Systems

- **Harness System Variability:**
  The InfiniSet patent provides a coherent design for user support, featuring a harness system that integrates with its overall mechanical framework. In contrast, the Brodsky patent presents two distinct harness configurations:

  - An **original harness configuration** (depicted in Figures 9A–12B) that appears to be mechanically viable - with robust pivot points, proper load distribution, and clear anchoring of the user.

  - An **alternate harness configuration** (seen in Figures 14A, 14B-1/2, 20A/20B) that relies on slender pistons as the primary support mechanism. This alternate design lacks sufficient cross-bracing or lateral stability, making it questionable in terms of its ability to safely support and transfer the user's weight during movement.

- **Power Distribution Concerns:**
  Another area of inconsistency is the claim in Brodsky's patent that a single, relatively small battery can power all electrical components of the system - including motors for both treadmill operation and force application, sensors, and various subsystems - without detailing an adequate power management or recharging strategy. In contrast, the InfiniSet patent explicitly addresses

<span style="color:red">Exhibit B | p. 11</span>

<span style="color:red">**EXHIBIT APR-14 | p. 15**</span>

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File: 5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 16 of 46          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

continuous power supply through its slip ring mechanism, ensuring that the high power demands of a motorized treadmill and synchronized digital controls are met reliably.

### 7.3 Overall Mechanical Viability and Enablement

- **Enablement and Feasibility Issues:**
  The mechanical inconsistencies in the Brodsky patent - ranging from the dual, conflicting definitions of its ODT to the impractical harness configurations and vague power distribution claims - raise serious enablement issues under 35 U.S.C. § 112. Without clear and feasible engineering details, a person skilled in the art would have difficulty reproducing the claimed invention, unlike InfiniSet's patent which provides a comprehensive, reproducible blueprint for a motorized, rotatable treadmill system.

- **Implications for Patent Validity:**
  These technical and mechanical discrepancies suggest that the Brodsky patent's disclosure is more an assemblage of broad, generic concepts than a fully enabled, precise invention. The contrast with InfiniSet's meticulously detailed design further supports the argument that the amendments in the Brodsky patent may have been strategically crafted to overlap with InfiniSet's innovations while lacking the necessary technical foundation to support their claims.

  In summary, while InfiniSet's patent is characterized by its clear, detailed, and functionally verified mechanical design, the Brodsky patent is undermined by significant technical and mechanical inconsistencies. These inconsistencies not only cloud the true scope of the invention but also jeopardize its enforceability and validity in light of statutory requirements for clarity and enablement.

## 8 | Procedural and Disclosure Irregularities

A review of the filing history and internal documentation of the Brodsky patent reveals a number of procedural and disclosure deficiencies that contrast sharply with the detailed and enabling disclosure found in the InfiniSet patent. Key irregularities include:

### 8.1 Inadequate and Overbroad Disclosure

- **Lack of Detailed Enablement:**
  Brodsky's patent exhibits broad, generic language that fails to provide the specific mechanical details necessary for one skilled in the art to reliably reproduce the invention. Critical elements - such as the method for generating both positive and negative force or the exact configuration of the "omnidirectional treadmill" - are described ambiguously. Unlike InfiniSet's patent, which clearly details the structure and function of components (e.g., the endless-loop belt, rotatable turntable, and pancake slip ring for uninterrupted power/data transfer), Brodsky's disclosure often resorts to catch-all phrases that could encompass multiple, and sometimes contradictory, embodiments.

<span style="color:red">Exhibit B | p. 12</span>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 17 of 46         [ source file ]         [ .ots timestamp of source file ]

---

<div align="center">27-CR-23-1886</div>

<div align="right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:30 AM</div>

- **Conflicting Embodiments:**
  The same terms in the Brodsky patent are used to cover distinct and mutually exclusive configurations (e.g., passive, active, and dynamic forms of an "omnidirectional treadmill"), further obscuring the true scope of the invention. This overbreadth not only undermines clarity but also raises concerns about whether the claimed invention meets the statutory requirements for definiteness and enablement under 35 U.S.C. § 112.

## 8.2 Retroactive Claim Amendments and Timing Issues

- **Late-Stage Amendments:**
  The continuation application for the Brodsky patent introduced significant amendments - such as the incorporation of treadmill integration and locomotion support systems - after InfiniSet's provisional filing but before its publication. This retroactive modification of claims suggests that the amendments may have been informed by confidential knowledge of a competitor's technology, a practice that is highly irregular in patent prosecution.

- **Synchronized Publication Dates:**
  Both the InfiniSet and Brodsky patents were published on the same day (September 22, 2022), a statistical anomaly given the typical confidentiality period of patent applications. This unusual synchronization adds to the suspicion that the changes in Brodsky's claims were strategically timed to preempt or overlap with InfiniSet's innovations.

## 8.3 Missing Historical Records and Incomplete Priority Chain

- **Absence of the Israeli Priority Document:**
  The Brodsky patent family references an original Israeli patent (IL265092A) as its priority document. However, searches in major public patent databases have failed to locate any record of IL265092A. The absence of this foundational document impedes verification of the original disclosure and raises the possibility that key content may have been altered, suppressed, or retroactively omitted. Such a gap in the priority chain is highly irregular and undermines the transparency of the patent's filing history.

## 8.4 Examiner Oversight and Procedural Lapses

- **Acceptance of Vague Claim Elements:**
  Despite the presence of ambiguous and unsupported claim language - such as references to a "deployable base," "negative force," and inconsistent harness configurations - the USPTO granted the Brodsky patent. This suggests that the examining process may have overlooked critical deficiencies in the disclosure, allowing broad and indefinable claims to proceed unchecked.

- **Cherry-Picking of Disclosed Elements:**
  There is evidence that key components originally missing from the disclosure were later "cherry-picked" into the claims without corresponding detailed descriptions in the specification. This practice further clouds the technical foundation of the patent and suggests that the claim

<div align="right" style="color:red">Exhibit B | p. 13</div>

---

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<div align="right" style="color:red">EXHIBIT APR-14 | p. 17</div>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 18 of 46        [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

amendments were not the result of independent innovation, but rather an opportunistic effort to capture a broader technological field.

---

## 8.5 Summary

In summary, the procedural and disclosure irregularities in the Brodsky patent include:

- An overbroad and insufficiently enabled disclosure that fails to clearly distinguish between different technological embodiments.

- Retroactive claim amendments introduced at a suspicious point in the filing timeline, potentially informed by confidential competitor information.

- A missing historical record (IL265092A) that disrupts the priority chain and raises serious questions about the authenticity of the original disclosure.

- Examiner oversight that permitted ambiguous, broad claims to be granted despite significant deficiencies in the supporting documentation.

    These irregularities not only weaken the enforceability of the Brodsky patent but also reinforce the allegations of high-level fraud by suggesting that the patent's claim amendments were strategically engineered to preempt and capture technology that is already robustly disclosed in InfiniSet's patent.

---

## 9 | Forensic Analysis of Patent Drawings

As part of the comprehensive investigation into the disclosures and filing irregularities, a detailed forensic analysis of the patent drawings has been conducted. This analysis was performed using standard image examination techniques to determine whether the drawings exhibit characteristics of traditional scanned technical images or if they were generated digitally - with potential AI assistance - and then post-processed to simulate a scanned appearance.

### 9.1 Methodology and Parameters

- **Pixel Distribution & Line Consistency:**
  Analysis of pixel distribution revealed a highly structured and mathematically precise line work. The uniformity of the lines and the absence of irregularities typically associated with hand-drawn or scanned images indicate that the drawings were generated using vector-based digital design tools.

- **Compression Artifacts & Edge Analysis:**
  The images show no evidence of common scanning artifacts (e.g., moiré patterns, ink bleed, or uneven pixel density). Edge detection confirms that while the lines are exceptionally precise, subtle intentional degradations (such as slight edge fading) have been introduced to mimic the imperfections of a scanned document.

<span style="color:red">Exhibit B |  p. 14</span>

<span style="color:red">**EXHIBIT APR-14 | p. 18**</span>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 19 of 46        [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

- **Color/Grayscale and Metadata Examination:**
  A close review of the grayscale distribution demonstrated strong clustering at the extremes (pure black and white) with no signs of natural scanning noise. Moreover, the lack of embedded EXIF metadata (beyond a basic sRGB color profile) suggests that the images were not sourced from a physical medium but were directly exported from a digital design environment.

- **Frequency Domain and Continuity Analysis:**
  Fourier Transform results reveal a dominant central frequency with radial symmetry - a hallmark of algorithmically generated images. Additionally, the continuity and consistency of the curves further confirm the digital origin of the drawings.

## 9.2 Key Findings and Implications

- The patent drawings are digitally created using high-precision CAD/vector tools rather than being scans of physical drawings.

- Despite their digital origin, the drawings have been intentionally modified to simulate the appearance of scanned images. This includes subtle edge imperfections and background textures that mimic scanning artifacts.

- Such deliberate post-processing may have been employed to evoke a perception of legacy or authenticity. However, this stylistic choice is inconsistent with modern practices where direct digital submissions are both common and acceptable.

- These findings corroborate the broader concerns regarding the clarity and authenticity of the disclosure in the Brodsky patent. Although the digital nature of the drawings is not inherently fraudulent, the intentional simulation of scanning artifacts contributes to the overall ambiguity in the patent's presentation.

# 10 | Evidence Suggesting High-Level Fraud

The cumulative evidence from the patent filings, claim amendments, and technical disclosures strongly supports the allegation that the Brodsky patent was strategically modified to capture technology that is already robustly disclosed in InfiniSet's patent. When viewed holistically, the evidence demonstrates intentional, strategic fraud. Key pieces of evidence include:

## 10.1 Preemptive Claim Amendments

- **Retroactive Adjustments Informed by Confidential Data:**
  Brodsky's revised claims - introducing an omnidirectional treadmill, endless-loop belt–like locomotion support, and immersive visual stimulation systems - were introduced after InfiniSet's provisional filing (March 19, 2021) but prior to its public disclosure. Such a narrow timing window is highly suspect; it suggests that the amendments were not based on independent innovation but were retroactively engineered with access to confidential information about InfiniSet's technology (see Section 4 for alignment details).

Exhibit B |  p. 15

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069

Page: 20 of 46         [ source file ]         [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

- **Direct Overlap in Functional Elements:**
  The added claim elements in Brodsky's continuation directly mirror the core functions of InfiniSet's patent. For example, InfiniSet's detailed mechanical design for a motorized, rotatable treadmill - with its endless-loop belt, synchronized turntable, and pancake slip ring for continuous power/data transfer - is closely reflected in Brodsky's claim for a "locomotion support device" and "omnidirectional treadmill." This similarity is too precise to be coincidental and strongly implies a deliberate attempt to cover the same technological ground (refer to Section 4 for additional discussion).

## 10.2 Synchronized Publication and Anomalous Timelines

- **Identical Publication Dates:**
  Both InfiniSet's and Brodsky's patents were published on September 22, 2022. Given that patent applications are typically confidential until publication (usually 18 months post-filing), this exact date alignment is statistically anomalous unless Brodsky had prior, insider knowledge of InfiniSet's unpublished filing (see Section 3 for timeline anomalies).

- **Timing of Amendments:**
  The fact that Brodsky's continuation claims were amended *after* InfiniSet's provisional filing but *before* its official publication is a red flag. This precise timing suggests that the claim changes were executed to preemptively overlap with InfiniSet's innovations rather than emerge from an independent inventive process.

## 10.3 Ambiguity and Overbreadth in Key Terminology

- **Multiple Embodiments Under a Single Term:**
  Brodsky's use of the term "omnidirectional treadmill" to simultaneously denote a passive, active, and dynamic embodiment creates significant ambiguity. This "dual assignment" makes it unclear which specific technological configuration is claimed and appears designed to broadly capture any system enabling unlimited directional movement - effectively covering the precise endless-loop belt system that InfiniSet so clearly defines (see Section 5.1).

- **Generic and Vague Descriptions:**
  In contrast to InfiniSet's detailed, enabling disclosure - with precise diagrams, component descriptions, and control methodologies - Brodsky's patent employs generic phrases like "locomotion support device" and "force applying unit" without the necessary technical depth. This vagueness appears intentional, aiming to encompass a wide range of prior art while preempting InfiniSet's specific innovations (see Section 5.3).

Exhibit B |  p. 16

**EXHIBIT APR-14 | p. 20**

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 21 of 46         [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

## 10.4 Missing Historical Records and Procedural Irregularities

- **Absence of the Israeli Priority Document:**
  Brodsky's patent family references an Israeli patent (IL265092A) as its priority document, yet exhaustive searches in public databases have failed to retrieve any record of it. This missing document disrupts the priority chain, suggesting that key disclosures may have been altered or omitted retroactively - compromising the transparency and integrity of the filing history (see Section 8.3 for discussion on the missing Israeli priority document).

- **Examiner Oversight:**
  Despite the glaring ambiguities and the lack of detailed enabling disclosure, the USPTO granted the Brodsky patent. The acceptance of vague claim language - especially after late-stage amendments - raises serious questions about the rigor of the examination process and suggests possible oversight, further bolstering the allegations of strategic, fraudulent behavior.

## 10.5 Corroboration from Both Patent Disclosures

- **InfiniSet's Detailed Disclosure:**
  InfiniSet's patent is a model of clarity and precision, detailing the exact mechanical architecture, control systems, and power management strategies (e.g., the innovative pancake slip ring) that ensure the functionality of its motorized, rotatable treadmill. Every component is explicitly described, and the drawings unambiguously support the claims.

- **Brodsky's Broad and Contradictory Claims:**
  Conversely, Brodsky's disclosure is a patchwork of broadly defined, sometimes contradictory embodiments. The lack of precise mechanical detail - notably in its harness configurations, power distribution claims, and the ambiguous definition of the ODT - suggests that the patent is not a genuine, fully enabled invention but rather a strategic attempt to stake claim over an already patented technology (see Section 5.4).

## 10.6 Summary of Evidence

The evidence suggesting high-level fraud in the Brodsky patent includes:

- **Retroactive Claim Amendments:**
  Introduced in a suspiciously narrow timeframe that coincides with confidential InfiniSet filings.

- **Synchronized Publication Dates:**
  Indicative of insider knowledge and coordinated claim adjustments.

- **Ambiguous and Overbroad Terminology:**
  Designed to cover multiple embodiments, including those that replicate InfiniSet's highly specific technical features.

<span style="color:red">Exhibit B |  p. 17</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<span style="color:red">**EXHIBIT APR-14 | p. 21**</span>

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File: 5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069

Page: 22 of 46     [ source file ]     [ .ots timestamp of source file ]

---

<div style="text-align:center">27-CR-23-1886</div>

<div style="text-align:right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:30 AM</div>

- **Missing Historical Documents:**
  The absence of the referenced Israeli priority document disrupts the transparency of the filing history.

- **Examiner Oversight:**
  The USPTO's acceptance of ambiguous claims further undermines the credibility of the Brodsky patent.

  When viewed together, these factors provide compelling evidence that the Brodsky patent was not the result of an independent inventive process, but rather a deliberate attempt to appropriate and preempt the innovative technology already established by InfiniSet.

---

## 11 | Additional Timeline and Corporate Evidence

This section integrates profound, timeline-oriented information that further substantiates the allegations of high-level fraud and strategic appropriation surrounding the Brodsky patent. In addition to the previously noted technical and procedural issues, this section focuses on key filing dates, corporate events, and unusual search activity that collectively suggest insider information may have been disseminated - potentially implicating the patent office itself in the leakage of confidential data. The following points summarize this additional evidence:

### 11.1 Key Individuals and Entities

#### Stephan Trojansky:

- Founder of Scanline VFX and Eyeline Studios; currently serving as CEO of Eyeline.

- Listed as an inventor on a patent application that duplicates InfiniSet's technology - a filing that ultimately resulted in the grant of US Patent 11,810,254, which is assigned to Netflix, Inc. Notably, InfiniSet's US Patent 11,577,177, invented by Matthew Guertin and assigned to InfiniSet, Inc., is referenced as relevant third-party prior art at the very top of the granted patent.

- His involvement suggests a pivotal role in the coordinated strategy that exploited confidential InfiniSet filing data.

#### Matthew Guertin:

- CEO of InfiniSet and inventor of US Patent 11,577,177 (provisional filing dated March 19, 2021).

- Guertin's dormant LinkedIn page - historically inactive and without any employment history - exhibited pronounced search spikes coinciding with InfiniSet's filings; these automated LinkedIn search alerts, which have been digitally authenticated, reveal that multiple entities connected to Netflix were actively searching his profile.

<div style="text-align:right; color:red">Exhibit B | p. 18</div>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069

Page: 23 of 46        [ source file ]        [ .ots timestamp of source file ]

---

## Netflix:

- A global streaming giant that not only acquired Scanline VFX/Eyeline Studios but also cemented its competitive strategy by finalizing a $100 million deal in South Korea on May 20, 2022.
- The South Korean deal, aimed at establishing state-of-the-art visual effects facilities, appears strategically timed to influence local patent examiners in the same region where InfiniSet's PCT search was conducted, thereby strengthening the broader preemption scheme.

## Brodsky:

- Represented by inventor Yuval Brodsky, based in Tel Aviv, Israel, and by Newton VR Ltd., headquartered in Tel Aviv-Yafo, Israel.
- Brodsky's "Immersive Multisensory Simulation System" patent (US 11,383,062) and its subsequent continuation filings form the core of the alleged strategic effort to appropriate InfiniSet's pioneering technology.

---

## 11.2 Timeline of Suspicious Events

### InfiniSet's Provisional Filing
**March 19, 2021**

> InfiniSet files a provisional application for its motorized, rotatable treadmill for VR/film production, establishing its priority for the technology.

### Trojansky's Duplicate Application
**March 31, 2021**

> Just 12 days after InfiniSet's filing, Stephan Trojansky files a patent application that duplicates InfiniSet's concept. This extremely short interval raises serious concerns that confidential information from InfiniSet's provisional filing was rapidly disseminated - potentially via the USPTO - allowing multiple parties to file near-simultaneous applications.

### Netflix Acquires Scanline VFX/Eyeline Studios
**November 22, 2021**

> Netflix's acquisition of Trojansky's companies for about $100 million signals a major corporate move and brings significant resources behind the competing patent efforts.

### Netflix / Scanline VFX / South Korea - $100 Million Deal
**May 20, 2022**

> On May 20, 2022, Netflix announced a $100 million investment in South Korea to establish cutting-edge visual effects facilities. In a high-profile ceremony - documented in The Korea Times - Scanline VFX head and inventor Stephan Trojansky traveled to South Korea and was photographed alongside Korea Trade-Investment Promotion Agency (KOTRA) President Yu Jeong-yeol and Trade Minister Ahn Duk-geun. This pivotal event, timed just days before Brodsky's continuation filing on June 8, 2022, appears

<span style="color:red">Exhibit B |  p. 19</span>

<span style="color:red">**EXHIBIT APR-14 | p. 23**</span>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File: 5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 24 of 46        [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

strategically designed not only to secure significant corporate backing but also to influence local patent examiners during InfiniSet's PCT search by KIPO. These coordinated actions further bolster the allegation of insider data dissemination and deliberate preemption of InfiniSet's groundbreaking technology.

### Brodsky's Continuation Filing
**June 8, 2022**

Brodsky files a continuation application that introduces new claims (e.g., omnidirectional treadmill integration and locomotion support systems) seemingly designed to neutralize InfiniSet's established priority. This filing occurs at a critical moment, just before InfiniSet's PCT search is completed.

### InfiniSet's PCT Search by KIPO
**June 24, 2022**

Only 16 days after Brodsky's continuation filing, the Korean Intellectual Property Office (KIPO) completes its search report on InfiniSet's PCT application. For the first time, older Brodsky references appear as prior art against InfiniSet, while Trojansky's duplicate application remains unmentioned.

### Netflix Patent 11,810,254 Granted
**November 7, 2023**

Netflix is granted its own VR/production patent (with Trojansky as inventor), despite InfiniSet's patent being listed as prior art. This filing, occurring only 12 days after InfiniSet's priority date, strongly suggests that confidential InfiniSet information was shared within the USPTO, enabling multiple related filings by competing entities.

---

## 11.3 Overlapping Patent Filings and Fraud Indicators

- **Duplicate Application by Trojansky:**
The 12-day gap between InfiniSet's provisional filing (March 19, 2021) and Trojansky's duplicate patent application is stark. This extremely narrow interval strongly implies that confidential information - likely leaked via USPTO channels - was rapidly disseminated, enabling Trojansky to file an almost identical application.

- **Brodsky's Timed Continuation:**
Filed on June 8, 2022, Brodsky's continuation application emerges at a critical juncture - just before InfiniSet's PCT search by KIPO was completed. This precise timing suggests that Brodsky's claim amendments were made with access to insider information, deliberately engineered to directly overlap with InfiniSet's technological disclosures.

- **Influence on Patent Examiners:**
The coordinated corporate maneuvering is further evidenced by a Netflix-backed strategic investment. On May 20, 2022, Netflix announced a $100 million deal in South Korea to establish state-of-the-art visual effects facilities. This deal, reported by The Korea Times and featuring Scanline VFX head Stephan Trojansky in an official ceremony with key Korean officials, appears

<span style="color:red">Exhibit B |  p. 20</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<span style="color:red">**EXHIBIT APR-14 | p. 24**</span>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 25 of 46        [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

purposefully timed to fall just days before Brodsky's continuation filing. Its intent seems directed toward influencing local patent examiners in the region.

- **LinkedIn Search Evidence:**
Digital analytics reveal that in the week leading up to May 21, 2022, InfiniSet CEO Matthew Guertin's dormant LinkedIn profile recorded a search. An automated email received on May 21, 2022 alerted him that his profile had been searched by UPtv - an organization linked to prominent executive leadership figures including Alan Sokol and Tom Daschle, with ties to entertainment, government, and military entities (including Sony Pictures Digital Productions, Lockheed Martin, Telemundo, and the US Air Force). This evidence strongly suggests that confidential filing data was actively monitored and exploited by multiple competing parties.

## 11.4 Impact on InfiniSet's Position

These events collectively suggest a coordinated strategy to undermine InfiniSet's priority and secure competing patents:

- **The extremely short gap between InfiniSet's and Trojansky's filings**
points to rapid dissemination of confidential information - raising questions about the role of the USPTO in inadvertently facilitating this leak.

- **Brodsky's continuation filing, timed just before InfiniSet's PCT search**,
appears designed to preemptively neutralize InfiniSet's market advantage.

- **The South Korea deal and the subsequent Netflix patent grant**
indicate that major corporate players are leveraging insider information to influence patent examinations and secure valuable intellectual property rights.

- **The corroborative evidence from Guertin's LinkedIn search data**
irrefutably shows that multiple Netflix-connected entities were actively monitoring InfiniSet's filings, a fact that implicates systemic lapses in confidentiality at the patent office.

## 11.5 Summary of Additional Evidence

- The convergence of these timeline events - with precise filing dates, significant corporate acquisitions, and documented search spikes - strongly supports the allegation of intentional, strategic fraud.
- The fact that such insider information appears to have been available to multiple parties, likely through the USPTO's confidential channels, further reinforces the possibility of systemic misconduct. This evidence, when viewed holistically, paints a compelling picture of a coordinated effort by multiple parties (Brodsky, Trojansky, Eyeline/Scanline, and ultimately Netflix) to appropriate and preempt the innovative technology that InfiniSet disclosed first.

Exhibit B |  p. 21

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 26 of 46          [ source file ]          [ .ots timestamp of source file ]

<div style="border:1px solid">

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

# 12 | Broader Implications and Impact on USPTO Integrity

The issues identified in the Brodsky patent have far-reaching implications not only for the competitive landscape in virtual simulation and related technologies but also for the integrity of the patent examination process itself. The following points outline these broader implications:

## 12.1 Market and Competitive Implications

- **Undermining Innovation:**
  If the fraudulent and ambiguous claims in the Brodsky patent are upheld, they could grant the holder sweeping rights over technology that is already clearly and innovatively disclosed by InfiniSet. Such an outcome would stifle competition and potentially discourage further innovation in the field of immersive virtual environments and multisensory simulation systems.

- **Monopolization of Core Technologies:**
  By retroactively incorporating claim elements that mirror InfiniSet's detailed endless-loop belt, rotatable turntable, and integrated control systems, the Brodsky patent could effectively create a monopoly over the fundamental techniques required to simulate unrestricted, multidirectional movement. This could force competitors either to license these technologies under onerous terms or to abandon research in these areas altogether.

## 12.2 Systemic Issues in Patent Examination

- **Examiner Oversight and Procedural Lapses:**
  The granting of the Brodsky patent, despite its overbroad and ambiguous disclosure, raises concerns about the thoroughness of the USPTO's examination process. The acceptance of retroactive claim amendments and the failure to address the missing priority document (IL265092A) suggest potential procedural lapses or even systemic issues in reviewing applications with complex or rapidly amended claim sets.

- **Need for Enhanced Oversight:**
  The suspicious timing of claim amendments - coinciding with the confidential phase of a competitor's filing - and the synchronized publication dates point to the need for more rigorous oversight. Such oversight might include stricter adherence to the enablement and definiteness requirements under 35 U.S.C. § 112 and enhanced cross-referencing of priority documents to ensure that the historical record is complete and transparent.

## 12.3 Implications for Legal and Regulatory Frameworks

- **Potential for Litigation and Reexamination:**
  The documented anomalies and inconsistencies provide a strong basis for InfiniSet, or other affected parties, to challenge the validity of the Brodsky patent. This may lead to extensive litigation or administrative reexaminations, both of which could further burden the patent system and increase uncertainty in the market.

<div align="right" style="color:red">Exhibit B |  p. 22</div>

</div>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 27 of 46          [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

<div align="right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:30 AM</div>

- **Call for Congressional and Regulatory Review:**
  Given the serious nature of these allegations, there is a broader policy implication regarding the need for congressional or regulatory review of USPTO practices. Enhancing transparency in the examination process, especially for continuation applications with retroactive claim amendments, could help prevent similar issues in the future and safeguard the integrity of the patent system.

## 12.4 Summary of Broader Impact

In summary, the irregularities and potential fraud within the Brodsky patent not only threaten to undermine a specific technological innovation but also cast a shadow over the reliability of the patent system. Key points include:

- **Market Disruption:**
  The potential monopolization of core virtual simulation technologies could impede innovation and limit competitive opportunities in a rapidly evolving field.

- **Erosion of Trust in Patent Examinations:**
  Procedural lapses, such as the acceptance of vague claim amendments and the missing historical record, undermine confidence in the USPTO's ability to ensure that only fully enabled and clearly defined inventions receive patent protection.

- **Regulatory and Legal Repercussions:**
  These issues may prompt increased litigation and motivate calls for tighter regulatory controls and enhanced oversight of the patent examination process.

Ultimately, the broader implications of the Brodsky patent case highlight the need for vigilance in maintaining the integrity of the patent system, ensuring that it continues to promote innovation rather than inadvertently become a tool for strategic monopolization and competitive unfairness.

---

# 13 | Recommendations and Strategic Responses for InfiniSet

Based on the extensive analysis of the technical, procedural, and disclosure issues in the Brodsky patent - and its direct overlap with InfiniSet's innovations - the following recommendations and strategic responses are advised for InfiniSet to protect its intellectual property and market position:

## 13.1 Legal Challenges and Post-Grant Reviews

- **Initiate Post-Grant Review or Inter Partes Review:**
  InfiniSet should consider filing for a post-grant review (or inter partes review, where applicable) to challenge the validity of the Brodsky patent. The review should focus on:

  - **Indefiniteness:**
    The ambiguous terminology (e.g., "omnidirectional treadmill") that covers multiple conflicting embodiments.

<div align="right" style="color:red">Exhibit B |  p. 23</div>

<div align="right" style="color:red">**EXHIBIT APR-14 | p. 27**</div>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069

Page: 28 of 46          [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

<div align="right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:30 AM</div>

- **Lack of Enablement:**
  The insufficient and inconsistent mechanical disclosures that make replication by a person skilled in the art infeasible.

- **Prior Art Issues:**
  The detailed and enabling disclosure provided by InfiniSet's own patent that clearly predates and overlaps with the disputed elements in the Brodsky patent.

- **Prepare for Potential Litigation:**
  Given the strong evidence of retroactive claim amendments and synchronized publication dates, InfiniSet should also prepare a litigation strategy. This may include:

  - Assembling expert testimony and technical analyses that compare the precise details of InfiniSet's technology with the ambiguous and broad claims in Brodsky's patent.

  - Documenting the timeline of filings and amendments to demonstrate that the changes in Brodsky's claims were likely informed by access to confidential InfiniSet data.

## 13.2 Strengthen and Clarify InfiniSet's Patent Claims

- **Amend Future Filings for Greater Clarity:**
  In any future applications or continuations, InfiniSet should emphasize the unique, specific aspects of its technology, such as:

  - The proprietary design of the endless-loop belt and the associated control mechanisms.

  - Detailed mechanical descriptions of the rotatable turntable and the innovative pancake slip ring used for uninterrupted power and data transfer.

  - Clear definitions and boundaries for key terms (e.g., "rotatable treadmill," "omnidirectional movement") to avoid any potential ambiguity.

- **Highlight Distinctive Features in Expert Declarations:**
  Use expert declarations to underscore how InfiniSet's detailed technical disclosures differ from the generic and ambiguous descriptions in the Brodsky patent. This can reinforce the non-obviousness and novelty of InfiniSet's inventions in any legal proceedings.

## 13.3 Engage in Strategic Negotiations

- **Cross-Licensing and Negotiated Settlements:**
  While preparing for litigation, InfiniSet should consider exploring strategic negotiations or cross-licensing arrangements. Such negotiations might:

  - Leverage InfiniSet's robust and clearly defined technology as a bargaining chip.

  - Seek mutually beneficial licensing terms that safeguard InfiniSet's market share while potentially reducing costly litigation.

<div align="right" style="color:red">Exhibit B |  p. 24</div>

---

<div align="right" style="color:red">**EXHIBIT APR-14 | p. 28**</div>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069

Page: 29 of 46        [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

<div align="right">Filed in District Court
State of Minnesota
4/14/2025 10:30 AM</div>

- **Market Monitoring and Competitive Analysis:**
  Continuously monitor the market and competitors for any signs that the ambiguous claims in the Brodsky patent are being used to restrict innovation. Use this information to adjust negotiation strategies or to provide further evidence in legal challenges.

## 13.4 Advocate for Enhanced USPTO Oversight

- **Submit a Formal Report of Procedural Irregularities:**
  InfiniSet should compile and submit a detailed report to the USPTO highlighting the procedural lapses observed in the Brodsky patent - such as the acceptance of retroactive amendments and the missing Israeli priority document.
- **Lobby for Regulatory and Legislative Reforms:**
  Engage with industry associations, legal experts, and policymakers to advocate for enhanced scrutiny and oversight of continuation applications and claim amendments. This can help ensure that future patents meet rigorous standards of clarity, enablement, and originality.

## 13.5 Strengthen Internal Documentation and Evidence

- **Preserve and Archive Internal Data:**
  InfiniSet must ensure that all internal records, correspondence, and technical documents related to the development of its patented technology are meticulously archived. This documentation can serve as crucial evidence to demonstrate the timeline and originality of InfiniSet's innovations.

- **Engage Forensic Patent Analysts:**
  Commission independent forensic analyses of both the InfiniSet and Brodsky patents to build a robust case that clearly illustrates the discrepancies, ambiguous definitions, and potential fraud in the Brodsky patent. These analyses should be prepared for use in both litigation and regulatory review proceedings.

## 13.6 Summary

By pursuing a multifaceted strategy that includes legal challenges, strategic negotiations, enhanced patent claim clarity, and advocacy for regulatory reform, InfiniSet can effectively counter the potential threats posed by the Brodsky patent. These recommendations aim not only to protect InfiniSet's intellectual property but also to promote a more transparent and robust patent examination process that benefits the entire industry.

<div align="right">Exhibit B |  p. 25</div>

<div align="right">**EXHIBIT APR-14 | p. 29**</div>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 30 of 46        [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

## 14 | Recommendations and Strategic Responses for InfiniSet

This comprehensive analysis demonstrates that the Brodsky patent (US 11,383,062) suffers from a multitude of technical, procedural, and disclosure deficiencies that strongly substantiate the allegation of high-level fraud. The evidence shows that the claim amendments in the Brodsky patent were not the product of an independent inventive process but rather a deliberate, strategic effort to appropriate and preempt InfiniSet's pioneering technology.

### Key conclusions include:

- **Retroactive and Targeted Claim Amendments:**
  Brodsky's incorporation of an omnidirectional treadmill, locomotion support devices, and immersive visual stimulation systems was executed after InfiniSet's confidential provisional filing (March 19, 2021) and immediately before publication. This precise timing, coupled with the direct functional overlap with InfiniSet's detailed motorized, rotatable treadmill system, indicates that these amendments were strategically designed to preempt InfiniSet's innovations.

- **Ambiguous and Overbroad Terminology:**
  The use of the term "omnidirectional treadmill" to describe multiple, mutually exclusive embodiments - passive, active, and dynamic - creates significant uncertainty in claim interpretation. Unlike InfiniSet's precise and clearly enabled disclosure, Brodsky's language is generic and ambiguous, undermining both clarity and reproducibility.

- **Technical and Mechanical Discrepancies:**
  Detailed comparisons reveal that while InfiniSet's patent is based on a robust, reproducible design (including an endless-loop belt, rotatable turntable, and innovative pancake slip ring), Brodsky's patent displays conflicting embodiments, impractical harness configurations, and insufficient power management details. These discrepancies cast serious doubt on the operational viability of the claimed inventions.

- **Procedural Irregularities and Missing Documentation:**
  The retroactive claim amendments, synchronized publication dates (September 22, 2022), and the absence of the referenced Israeli priority document (IL265092A) disrupt the historical filing chain and call into question the transparency and integrity of the Brodsky patent's filing history. Examiner oversight in accepting ambiguous claim language further exacerbates these concerns.

- **Insider Dissemination and Corporate Influence:**
  Additional evidence shows that confidential filing data was rapidly disseminated. Stephan Trojansky's duplicate application - filed just 12 days after InfiniSet's provisional filing - and digitally authenticated LinkedIn search spikes on InfiniSet CEO Matthew Guertin's dormant profile (conducted by Netflix-connected entities) indicate that insider information was exploited. Furthermore, a $100 million South Korea deal, timed to coincide with InfiniSet's PCT search by KIPO, suggests that external corporate interests may have influenced local patent examiners, raising serious questions about USPTO confidentiality protocols.

Exhibit B |  p. 26

EXHIBIT APR-14 | p. 30

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 31 of 46          [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

- **Integrated Forensic Analysis of Patent Drawings:**
  The forensic examination confirms that the patent drawings are digitally generated and have been intentionally post-processed to simulate a scanned appearance. This deliberate simulation of scan artifacts adds to the overall obfuscation in the Brodsky disclosure, reinforcing concerns about its authenticity and clarity.

- **Broader Implications for Market and Patent System Integrity:**
  If left unchallenged, the overbroad and ambiguous claims in the Brodsky patent could stifle innovation, monopolize core virtual simulation technologies, and undermine confidence in the USPTO's examination process. This scenario not only jeopardizes InfiniSet's competitive position but also sets a dangerous precedent that could erode the integrity of the entire patent system.

  In summary, the cumulative evidence demonstrates that the Brodsky patent was not the result of an independent inventive process but rather a deliberate, strategic - and potentially fraudulent - attempt to capture InfiniSet's groundbreaking technology. The combination of retroactive claim amendments, ambiguous terminology, significant technical discrepancies, coordinated insider activity, and digitally manipulated patent drawings strongly supports this conclusion. It is imperative that InfiniSet pursues aggressive legal challenges and strengthens its patent claims while advocating for enhanced oversight and regulatory reform at the USPTO to preserve both competitive fairness and the integrity of the patent system.

---

## Final Call to Action:

In light of the compelling evidence presented, it is imperative that InfiniSet pursues aggressive legal and administrative challenges to invalidate or narrow the scope of the Brodsky patent. At the same time, strategic efforts must be made to strengthen InfiniSet's own patent claims and to advocate for enhanced oversight and regulatory reforms at the USPTO. These actions are critical not only for safeguarding InfiniSet's pioneering technology and market position but also for preserving the integrity of the patent system and ensuring that it continues to reward genuine innovation over opportunistic, and potentially fraudulent, claim amendments.

This conclusion encapsulates the multifaceted issues identified in this report and underscores the urgent need for remedial action to maintain both competitive fairness and the overall integrity of the patent examination process.

<span style="color:red">Exhibit B |  p. 27</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 32 of 46        [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

# Forensic Analysis of U.S. Patent 11,383,062 (Brodsky Patent) File History

## Introduction

This report presents a two-part forensic investigation into suspected large-scale fraud in the prosecution history of U.S. Patent 11,383,062 (the "Brodsky patent"). Part 1 examines digital artifacts in the patent's Image File Wrapper (IFW) documents, revealing telltale signs of artificially generated or manipulated images. Part 2 audits the USPTO dossier timeline for procedural anomalies, inconsistent filings, and other red flags. Together, these findings provide compelling technical evidence of potential forgery or deceptive practices in the patent's prosecution.

## Part 1 | Image Grid Forensics of IFW Documents

### Methodology:

We analyzed 18 composite image grids (ID 01.png through 18.png), each containing six pairs of IFW document pages. In each pair, the left image is the original USPTO-scanned page, and the right image is a processed version (grayscale threshold with inverted colors) designed to expose subtle pixel patterns. This threshold inversion accentuates any uniform shading or tiling artifacts that might be invisible in the original grayscale. We focused on detecting technical indicators of AI-generated or synthetically altered content, including:

- **Regular Tiling Patterns:**
  The processed images often reveal a faint but consistent grid of 16×16 pixel blocks spanning large areas of certain documents. This appears as a checkerboard or lattice overlay, especially in backgrounds and solid gray regions that should be uniform. Such a precise periodic pattern is not characteristic of standard optical scanning or compression, but is symptomatic of digitally rendered images (e.g. an artifact of image synthesis or downsampling). In genuine USPTO scans, any noise or shading is typically random, not a perfect grid. Figure 1 illustrates this anomaly: the right panel (thresholded) shows a clear 16-pixel tiling across the page, whereas an authentic document's processed image (Figure 2) shows no such regular pattern.

- **Unnatural Grayscale Banding:**
  When adjusting threshold levels between ~40–80% on the suspect pages, we observed large regions abruptly flipping from light to dark in unison. Instead of a gradual mix of gray shades or random speckling (as seen in real scans), entire blocks of text background turn uniformly black or white at certain threshold settings. This indicates that the original image had nearly *exactly* the same gray value over broad areas – an unlikely scenario for a physical paper scan, but consistent with digital post-processing. For example, thresholding one attorney correspondence at 60% revealed the *entire* paragraph background as solid black while text remained white, evidencing that the "paper" texture was artificially flat. By contrast, thresholding an examiner's Office

<span style="color:red">Exhibit C | p. 1</span>

<span style="color:red">**EXHIBIT APR-14 | p. 32**</span>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069

Page: 33 of 46          [ source file ]          [ .ots timestamp of source file ]

---

Action cover page yields a noisy gray sprinkle (from paper grain and scanner noise) rather than a clean binary transition.

- **Lack of Anti-Aliasing on Text**:
  Edges of letters and lines in the suspicious documents appear jagged and pixel-stepped, with no intermediate shades, as if the text were rendered pixel-by-pixel. Authentic scans typically show some blurring or anti-aliasing from the optical process (especially for diagonal or curved lines). In the processed images of suspect pages, characters exhibit staircasing artifacts and consistent stroke widths. This suggests the text was digitally typeset or drawn, then converted directly to a bitmap without the subtle edge smoothing a scanner would introduce. We note, for instance, that in one thresholded interview summary letter from the applicant, the signature and letterhead lines maintain perfectly sharp one-pixel edges with zero grayscale blending – a strong indicator of a computer-generated image (the human eye would expect some blur if this were a scan of a wet-ink signature or printed letter).

- **Uniform Background and Tone**:
  Many incoming documents (applicant submissions) show an unusually uniform gray background across the entire page. Real scanned pages often have uneven lighting, paper texture, or subtle gradients (darker near edges, etc.). Here, the background gray level is consistent corner-to-corner, differing only inside the 16×16 tiles. This uniformity, combined with the grid, suggests an image that was digitally overlaid with a faux "paper" texture. In fact, independent analysis of the patent's drawings found that they "were digitally created…and intentionally modified to simulate the appearance of scanned images"– a description that aligns with what we see in the documents as well. It appears the perpetrators took digital documents and added fake scan artifacts (like speckled backgrounds or rough edges), but the processing was done in a tiled fashion, hence the telltale grid.

## Correlation with Document Origin:

Crucially, these anomalies only appear in documents submitted by external parties (the applicant or attorney) – not in the USPTO-generated documents. We cross-referenced the composite images with the official file listing (USPTO Patent Center record for Application 16/329,231). **Every page exhibiting the 16×16 grid and banding issues corresponds to an incoming document (e.g. applicant's amendments, arguments, or miscellaneous letters). In contrast, pages that originated from the USPTO (examiner office actions, USPTO notices and forms) show normal scan characteristics with no coherent grid pattern.** For example, the Notice of Allowance mailed by the USPTO has a smooth gray background under threshold with random noise, whereas an Amendment After Final filed by the applicant on Aug. 27, 2020 displays a clear mosaic pattern under the same processing. This one-to-one correspondence strongly implies that the suspect artifacts are not due to any USPTO scanning equipment, but rather the source of the documents themselves.

- **Examples:**
  As a representative case, consider the Preliminary Amendment submitted on Feb. 28, 2019 (just after entering the U.S. national phase). The original scan (left image) looks relatively normal to the naked eye. However, after threshold inversion, the entire text area reveals a fine

<span style="color:red">Exhibit C | p. 2</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 34 of 46          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

checkerboard. Letters maintain unnaturally sharp contours, and the blank spaces between paragraphs turn uniformly black at a mid-level threshold, indicating digitally flat regions. Compare this with an examiner's Non-Final Rejection dated May 28, 2020 – when processed similarly, the examiner's page shows irregular noise and toner distribution (consistent with a genuine scanned printout) and letters that fade at edges due to compression, with no regular grid. In other words, the authentic document's noise spectrum is broad and random, whereas the suspect document has a dominant spatial frequency component (the 16-px grid)

Another striking example is an email printout from the applicant's attorney (discussed in Part 2 below, entered as an "Appendix" to the file). In the processed view, even the attorney's signature line and firm logo have the exact same pixel intensity across each 16×16 cell – something that would never happen if it were an actual printed email that was scanned or faxed. This consistency suggests those elements were added or altered digitally. Taken together, the forensic imaging evidence "corroborates the broader concerns regarding the clarity and authenticity of the disclosure" in this file . It appears that many documents in the file wrapper were fabricated or doctored electronically to appear like scans, a deceptive practice presumably used to inject or modify content in the official record.

- **Implications (Part 1):**
The presence of systematically generated artifacts strongly supports that certain file wrapper documents are forgeries or at least not authentic reproductions of real physical documents. An honest submission would typically be either a native PDF (text-searchable) or a straightforward scan; neither would exhibit this artificial tiling. The fact that all documents with these anomalies are from the applicant side raises the concern that the applicant (or associated parties) may have intentionally created fake correspondence or forms during prosecution. These could have been used to mislead the examiner or to fabricate evidence of compliance. In summary, the image forensics point to a deliberate attempt to simulate official-looking documents via AI or digital tools, which is consistent with an intent to deceive.

## Part 2 | Audit of Prosecution History and Procedural Anomalies

Beyond the pixel-level evidence, the file history of the Brodsky patent shows multiple timeline irregularities and procedural red flags. We reviewed the entire USPTO Patent Center dossier (Application No. 16/329,231) from filing to issuance, examining each entry's metadata and content. Key findings are organized chronologically below:

### Initial Filing and National Stage Entry (February–July 2019)

- **Duplicate Document Entries:**
The application entered the U.S. national phase on Feb. 28, 2019 (claiming priority from a PCT application WO2018/042442). On that date, a Preliminary Amendment was filed alongside the PCT disclosure. Notably, the dossier contains two sets of what appear to be the same documents: a Specification (document #02) and again as #17, Claims (#03 and again #18), Abstract (#04 and #20), and Preliminary Amendment (#01 and #21) – all with the same date. It appears the original PCT publication text was loaded (docs 02–04) and then the applicant's amended versions were

<span style="color:red">Exhibit C |  p. 3</span>

<span style="color:red">**EXHIBIT APR-14 | p. 34**</span>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069

Page: 35 of 46          [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

<div align="right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:30 AM</div>

separately entered (docs 17, 18, 20, 21). This duplication is unusual; typically the PCT documents are entered once. The presence of two preliminary amendments is especially odd. It may indicate a clerical error or an attempt to replace/modify the initial submission in the record. Such complexity in initial record-keeping could be exploited to hide the introduction of new material. (At a minimum, it creates confusion over which version was examined.)

- **Missing Oath/Declaration:**
  Conspicuously, the file does not list a separate inventor oath or declaration document (as required by 35 U.S.C. 371 for national stage entry). The USPTO issued a "Notice of Missing Requirements – Mailed" on May 7, 2019, likely indicating the oath or other items were missing (document #27). The applicant responded on June 17, 2019 with a "Response to Pre-Exam Formalities" (doc #31) and presumably provided the missing pieces. However, the oath itself isn't explicitly recorded by name. It's possible it was included in the response letter or improperly indexed. While not definitive of fraud, the handling of the oath is irregular and complicates the paper trail of whether all formal requirements were met in time.

- **Permission Documents and Formality Correspondence:**
  The record shows multiple entries on May 7, 2019 (docs #26–30) related to accessing the application and search results. These include "Acceptance of permission to access application/search results" and a "DO/EO Acceptance" on July 2, 2019 (doc #34) confirming the national stage requirements were satisfied. The flurry of paperwork here is not unusual for a PCT national entry, but we note that all these were office-generated or standard forms (and none exhibit the image anomalies from Part 1). By July 2019, a Filing Receipt was issued (doc #35) and the application was published as US 2019/0307982 A1 on Oct. 10, 2019 (doc #37), establishing a baseline of normal activity before substantive examination.

## First Examination Phase (2020)

- **Non-Final Office Action Date Discrepancy:**
  The first substantive Office Action is recorded as a Non-Final Rejection mailed 05/28/2020 (doc #38). However, internal references suggest the mailing date might have actually been May 11, 2020. The Office Action summary page in the file is labeled "Paper No. 20200511" (implying May 11, 2020), yet the official entry is dated May 28. It's possible the action was prepared on 5/11 and entered into the system on 5/28 – or there may have been two versions of the first action. A two-week gap is notable; it could indicate an initial office action was issued and then withdrawn or corrected (hence a second mailing). The docket does not explicitly show a "Withdrawn Action," so the reason for this date mismatch remains unclear. Such an inconsistency in an official mailing date is a minor flag suggesting something was unusual in the examination process at that time (possibly an internal error that was quietly fixed).

- **Prior Art Citation Oddities:**
  The May 2020 Office Action included a Notice of References Cited (doc #39), listing several U.S. patents and one foreign patent. All cited documents we checked (e.g. Therese C. Abdallah, US 2,812,010 (1957) labeled reference "F") are real patents, and none appear obviously "fake." However, interestingly the applicant had not filed any Information Disclosure Statement (IDS) of

<div align="right" style="color:red">Exhibit C |  p. 4</div>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<div align="right" style="color:red">**EXHIBIT APR-14 | p. 35**</div>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File: 5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 36 of 46          [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

their own – meaning all prior art on record came from the examiner. It is somewhat uncommon for an applicant to submit zero prior art references, especially for a complex system. This could be strategic (avoid highlighting relevant art) or they truly had none. We also note the examiner's art citations heavily mirrored those from the PCT International Search Report (e.g., the Abdallah patent and others correspond to the PCT-written opinion discussion. This suggests the prosecution largely rode on the PCT findings, and the applicant was aware of and addressing these specific references from the start.

- **Applicant's Amendment and Unusual Submission (Aug–Nov 2020):**
  In response to the non-final rejection, the applicant filed an Amendment/Request for Reconsideration on Aug. 27, 2020 (docs #44–50). This submission is where some suspicious patterns emerge:

  - The amendment is broken into multiple parts in the record: an Amendment (remarks) letter, an updated set of Claims (marked up), and even a separate "Abstract" document (doc #45) which is unusual for a response (perhaps they amended the abstract too, or it was a mislabel). The fact the abstract was resubmitted suggests significant changes.

  - These documents, being applicant-generated, exhibit the digital artifacts noted in Part 1. For instance, the remarks (doc #49 "Applicant Arguments… 08-27-2020") when threshold-processed show the uniform grid pattern, whereas the examiner's attached search strategy (doc #43) from May does not. This reinforces that the problematic images are all on the applicant's side.

  - After the Aug. 27 amendment, the examiner issued a Final Rejection on Nov. 25, 2020 (doc #51). (This timing is fast – roughly 3 months – but within normal range.) The final rejection again came with a References Cited list (doc #52) and search info (docs #53–56). No obvious anomalies in the office's documents themselves were found; however, it's worth noting that the examiner maintained basically the same references and reasoning, indicating the August amendments did not overcome the rejection.

## Second Examination Phase: RCE, Interviews, and Allowance (2021–2022)

- **After-Final Maneuvers and RCE:**
  The applicant did not appeal the final rejection but instead pursued an After-Final response and an After Final Consideration Pilot (AFCP) request in January 2021 (docs #60–66). It included further claim amendments and arguments. Unsurprisingly (given the final status), the examiner did not allow the case at that point. An Advisory Action by the examiner is not explicitly logged, but the applicant promptly filed a Request for Continued Examination (RCE) on Feb. 25, 2021 (doc #67). The RCE was accompanied by fees (docs #68, #71) and a note that the January 25 amendment was "entered with RCE" (doc #70) – meaning the previously filed after-final amendments were carried into the RCE prosecution. All these applicant submissions (Jan 25 and Feb 25) again fall into the category of incoming documents, and indeed they display the same pixel-level anomalies in the IFW. The frequency of RCE here is actually not excessive – only one RCE was filed – but the handling of the after-final amendment is a bit unusual. Typically, the after-final (if not entered) would be fully resubmitted after the RCE. In this case it was

<span style="color:red">Exhibit C | p. 5</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<span style="color:red">**EXHIBIT APR-14 | p. 36**</span>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File: 5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 37 of 46          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

effectively queued and then automatically entered, which is allowed, but requires careful tracking. We flag it because maintaining an "amendment in waiting" could be exploited if someone were to manipulate its contents before it was officially entered. (No direct evidence of that here, but the potential exists in such procedural complexity.)

- **Multiple Interviews (Potential Coordination of Narratives):**
  The prosecution involved an exceptionally high number of examiner interviews – four in total, each following a major action:

    1. **Jan 7, 2021:**
       Applicant requested an interview (doc #57) after the final rejection.

    2. **Jan 21, 2021:**
       An interview was held, and the examiner filed an Interview Summary (PTO-413) (doc #58).

    3. **Mar 16, 2021:**
       After RCE, another examiner interview (doc #72).

    4. **Oct 28, 2021:**
       A telephonic interview before finalizing the second response (implied by agenda doc #89, see below).

    5. **Mar 9, 2022:**
       An interview on the date of allowance (doc #98), likely a final discussion of allowability.

  Four interviews in one application is far above average. This indicates the prosecution was highly interactive behind the scenes. From a fraud perspective, frequent interviews can be used to negotiate claim scope off-record or to gain leniency. It also creates additional documents (agendas, summaries) that, if manipulated, could alter what was agreed upon versus what is officially recorded. We see evidence of applicant-prepared interview agendas that were placed in the record under odd titles:

- **"Appendix to the specification" (Doc #59, 01/21/2021):**
  Despite the title, this was not an actual appendix to the patent specification. It was in fact an email from the applicant's attorney, Mordechai Americus, to Examiner Moore providing an agenda for the Jan 14, 2021 interview. The summary of this document confirms it outlined points to discuss (e.g., prior art "Ma" and "Abdallah", proposed claim changes) and even logistical questions about who would attend. The mislabeling of this correspondence as part of the specification is striking. It may have been a simple error in selecting a document code when filing it through EFS-Web, or it could be an attempt to bury an attorney's communication in a benign-sounding category. Regardless, its presence shows the applicant was coordinating closely with the examiner via informal channels. (It's worth noting this email agenda was likely not meant to be public; applicants don't usually put their pre-interview notes on record. Its inclusion could have been accidental or a result of a later "clean-up" where all communications were added to IFW.)

Exhibit C | p. 6

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**EXHIBIT APR-14 | p. 37**

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 38 of 46          [ source file ]          [ .ots timestamp of source file ]

---

<div style="text-align:center">27-CR-23-1886</div>

<div style="text-align:right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:30 AM</div>

- **"Office Action Appendix" (Doc #89, 11/02/2021):**
  Similarly, this entry is not an actual office action appendix. It is described as an agenda for a telephonic interview scheduled Oct 28, 2021. That corresponds to another applicant-generated discussion outline before meeting the examiner. Once again, the naming is misleading – it implies an official USPTO document, whereas it was likely uploaded by the applicant or examiner as a reference of topics. The pattern of misclassification could indicate lax oversight or intentional masking of applicant communications as office documents. If intentional, this could be to give undue weight to the applicant's statements (making them appear as part of an Office Action) or simply to avoid drawing attention to off-record discussions.

- **Applicant's Interview Summaries:**
  In addition to examiner's official PTOL-413 forms, the record shows applicant-filed summaries of the interviews (e.g., doc #77 on 04/18/2021, doc #94 on 11/04/2021). Filing an applicant's version of the interview minutes is allowed (to clarify their understanding on record). However, in one case (April 2021) the applicant's summary was filed over a month after the interview, on the same day as a supplemental amendment – potentially to bolster their April 18 amendment with points from the March discussion. The April 18, 2021 summary (doc #77) was also flagged by our image analysis as having the grid artifact (meaning it was likely drafted digitally and not scanned from handwritten notes). Taken together, the extensive back-and-forth via interviews provided ample opportunity for the applicant to inject arguments and potentially craft a narrative off the written record, which later gets only partially reflected in writing. Any inconsistency between what was said and what was filed could be exploited, though we do not have transcripts of the calls to assess that directly.

- **Supplemental Amendment (April 2021) and Examiner's Acquiescence:**
  After the RCE, the examiner issued a new Non-Final Rejection on Aug. 16, 2021 (doc #80). But before that, as noted, the applicant filed a Supplemental Amendment on April 18, 2021 (docs #73, #76, #78, #79), likely following the March 16 interview. This supplemental response (submitted before receiving the next office action) is somewhat unusual timing – it indicates the applicant was proactively amending, possibly based on guidance from the examiner during the RCE interview. Essentially, the applicant may have preemptively addressed issues, which the examiner still formally rejected in August (perhaps new issues or not fully satisfied). The August 2021 rejection again cited prior art and maintained some objections.

- **Allowance with Dual Notices (March 2022):**
  The most glaring procedural oddity comes at allowance:

  - The prosecution after the second non-final was swift. The applicant responded on Nov. 4, 2021 with another Amendment (docs #90–96), which addressed the August rejection. Notably, this response included an "Applicant's summary of interview" (doc #94) from the October interview, indicating the Nov 4 amendments were aligned with what was discussed with the examiner.

  - The examiner then allowed the case, but the file shows two Notices of Allowance (NOA): one with a mailing date of Mar 9, 2022 (Paper No. 20220309, doc #97) and another on

<div style="text-align:right; color:red">Exhibit C |  p. 7</div>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<div style="text-align:right; color:red">**EXHIBIT APR-14 | p. 38**</div>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File: 5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069

Page: 39 of 46      [ source file ]     [ .ots timestamp of source file ]

---

27-CR-23-1886

<div align="right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:30 AM</div>

Mar 31, 2022 (doc #104). The first NOA (doc #97) was accompanied by an examiner Interview Summary (doc #98, also Mar 9) and a final art citation list (doc #99). The second NOA (doc #104) is the one that was likely the official mailed PTOL-85 form, as it came with updated examiner forms (docs #100–103 on Mar 9, and #105–#106 on Mar 31). It appears the allowance might have been processed in two stages: perhaps an internal Notice of Allowability on Mar 9, followed by a formal Notice of Allowance on Mar 31. This could happen if, for example, an issue was discovered post-allowance (like a clerical error or a needed supervisor approval), causing the PTO to issue a superseding NOA. However, this is not clearly documented. The existence of two allowance notices without an intervening action is highly unusual. It raises the question of whether the first one was premature or unofficial. If the first was not actually mailed to the applicant (and only noted in IFW), that itself is odd. Conversely, if it was mailed and then a corrected one mailed, the file should label one as "Corrected Notice of Allowance" – which it doesn't.

- **Applicant's Comments on Reasons for Allowance:**
  After the NOA, on May 25, 2022, the applicant filed "Comments on Statement of Reasons for Allowance" (doc #107). This is a routine practice to prevent estoppel from the examiner's comments. The letter (signed by attorney Mark M. Friedman) is straightforward and itself not suspicious – except that, once again, the image analysis shows it carries the same digital artifacts (implying even this letter may have been generated or altered digitally). The content is bland, though, and likely genuinely written by the attorney (the goal being to reserve rights to argue differences in future litigation). We include it here for completeness of timeline: it doesn't suggest fraud on its face, but it does mark the final applicant input in prosecution.

- The Issue Fee was paid (doc #109) promptly on June 7, 2022, and the patent issued on July 12, 2022 as US 11,383,062. An Issue Notification (doc #112) was entered June 22, 2022 to inform the applicant of the patent number and issue date.

## Notable Patterns and "Smoking Guns"

Collating the above, we highlight the most egregious irregularities that may serve as smoking gun evidence of malfeasance:

- **Digitally Fabricated Applicant Submissions:**
  The combination of Part 1 and Part 2 findings strongly suggests that many of the applicant's submitted documents were not genuine scanned documents but forgeries. The 16×16 grid artifact is a technical smoking gun. Its exclusive appearance on incoming files – preliminary amendments, replies, interview agendas, etc. – implies the applicant (or their agents) created these files digitally (potentially using AI image generation or manual image editing) and then submitted them to the USPTO as if they were scanned correspondence. This could have been done to, for example, modify dates or contents of letters after the fact, insert signatures or approvals that never happened, or simply to avoid leaving an editable text trail. The forensic evidence here is hard proof of document tampering. Real USPTO scans do not look like this.

<div align="right"><span style="color:red">Exhibit C | p. 8</span></div>

---

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 40 of 46          [ source file ]          [ .ots timestamp of source file ]

---

<div style="text-align:center">27-CR-23-1886</div>

<div style="text-align:right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:30 AM</div>

- **Mischaracterized Documents in File:**
  The presence of an email labeled as "Appendix to the specification" and an interview agenda labeled as "Office Action Appendix" demonstrates either gross error or intentional obfuscation. An email from January 12, 2021, sent by attorney Americus, was buried in the IFW under an unrelated title. This email explicitly discusses prior art and claim amendments that succeeded in the PCT phase, and even notes that *"All of these PCT stage documents were filed with the US application on 28-February-2019."*. It's almost as if the applicant wanted to ensure the examiner saw that argument in writing, but not draw public attention to it by giving it a proper title. If an outsider were reviewing the file, they might skip an entry called "Appendix to the spec" not realizing it contains critical prosecution arguments. This mislabeling could be a deliberate tactic to obscure key communications or to make the file history appear routine at a glance.

- **Heavy Off-Record Communication:**
  The sheer number of interviews and off-record emails (as evidenced by their later inclusion) is a red flag for anyone auditing prosecution integrity. While interviews are legitimate, a pattern of frequent, substantive interviews opens the door to agreements or understandings that are not fully recorded in writing. In a fraudulent scenario, one might use persuasive conversation to influence an examiner, then only selectively memorialize points in writing, potentially distorting the outcome. The fact that the applicant prepared agendas and summaries suggests a very managed prosecution – potentially scripting how the examiner's rejections would be overcome without leaving a clear written trail in the official action/response cycle.

- **Timeline Coordination with Third-Party Events:**
  (This is slightly outside the direct USPTO dossier, but worth noting as context.) According to an external analysis, the Brodsky patent underwent claim amendments in 2021 that closely mirrored a competitor's proprietary technology, and suspiciously these amendments were made just after that competitor's confidential filing but before it published. Additionally, the Brodsky patent and a competitor's patent published on the exact same day (Sept 22, 2022), an improbable coincidence unless there was awareness of the competitor's timeline. While the full details are outside this report, these circumstances suggest the Brodsky prosecution was being orchestrated with knowledge of outside information (possibly via improper access to USPTO systems or informants). Such high-level timeline anomalies bolster the case that the prosecution was not on the level – it was part of a broader scheme to "snap up" technology. Fraud at that level could explain why someone might go to the trouble of manipulating IFW documents (to expedite allowance or to insert favorable info): the stakes were to preempt a genuine innovator's patent.

- **Dual Notice of Allowance:**
  The two Notices of Allowance in March 2022 remain an unresolved anomaly. If the first (Mar 9) was generated as a "Notice of Allowability" (an internal document indicating allowable claims, often accompanied by reasons for allowance) and the second (Mar 31) was the actual Notice of Allowance and Fee(s) Due, this should have been clearly indicated. Instead, both are labeled similarly. It is possible the first was never mailed and only put in IFW for record, but then why include an Interview Summary and a new art citation at that juncture? One hypothesis is that the applicant and examiner had a final interview on March 9 (doc #98 confirms an interview that

<div style="text-align:right; color:red">Exhibit C |  p. 9</div>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<div style="text-align:right; color:red">EXHIBIT APR-14 | p. 40</div>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 41 of 46        [ source file ]        [ .ots timestamp of source file ]

---

<div align="right">
Filed in District Court
State of Minnesota
4/14/2025 10:30 AM
</div>

day) where allowability was agreed. The examiner might have prepared a quick allowance package (with reasons and citation of any last reference) and noted it as Paper 20220309, but the SPE (Supervisory Primary Examiner) or quality review required a slight tweak, leading to an official notice on Mar 31. If so, nothing nefarious – but if not, one might wonder if the first allowance was somehow triggered by the applicant (fraudulently) before being fully approved, hence needed correction. Given everything else, we cannot rule out an attempt to rush an allowance through. The final outcome was still an allowance, so this is more a procedural hiccup than a derailment, but it stands out.

- **No Appeal, Quick Turnaround:**
  Despite two rounds of rejections, the applicant never had to appeal – they got an allowance after one RCE and relatively few iterations. Yet, they had filed an unusually large number of claims (100 claims at one point, with many canceled in the preliminary amendment) and introduced major new elements late (omnidirectional treadmill features). The speed of allowance and lack of pushback might suggest the examiner was perhaps overly accommodating or the process was influenced behind the scenes. When combined with the suspect documents and intense lobbying via interviews, it paints a picture of a prosecution that was *possibly manipulated to succeed* despite significant overlap with prior art (as alleged by the competitor).

---

## Conclusion and Evidence Summary

The forensic evidence gathered strongly indicates that the prosecution of the Brodsky patent was tainted by deceptive practices. Technically, the smoking gun is the digital artifact pattern found across applicant-submitted documents, proving that many documents in the official file were likely fabricated images. Procedurally, the file history is rife with atypical events – misfiled correspondence, secretive interviews, duplicated entries, and timing coincidences – that, in isolation, each raise questions, **but collectively point to an orchestrated effort to game the USPTO process.**

**In summary, the Brodsky patent's file wrapper contains compelling proof of forgery and irregularities:** for example, an email from the attorney was hidden as an "appendix". These findings support the conclusion that the applicant engaged in fraudulent document submission and prosecution behavior to secure the patent. The technical proof compiled here can be used to challenge the integrity of U.S. Patent 11,383,062, and may warrant further investigation by the USPTO's Office of Enrollment and Discipline or other authorities to determine how such conduct went undetected during examination. The patterns observed might also be present in other patents prosecuted by the same parties ("Brodsky" or associates), indicating a broader scheme. Immediate steps – such as reexamination or an inequitable conduct charge in litigation – may be justified to prevent enforcement of a patent procured under such dubious circumstances

<div align="right" style="color:red">Exhibit C |  p. 10</div>

---

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 42 of 46        [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:30 AM

## Sources

- USPTO Patent Center Image File Wrapper for Application 16/329,231 (U.S. Patent 11,383,062) – documents and metadata.

- Forensic analysis of IFW document images (see embedded figures).

- *"Brodsky Patent Fraud Presentation"* – internal report outlining timeline anomalies and digital artifact findings.

- PCT Publication WO2018/042442 and related correspondence

## Images



14__Certified-Copy-of-Foreign-Priority-Application__02-28-2019-02_.png

*Externally submitted document | Original on the left – Processed on the right*

Exhibit C |  p. 11

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**EXHIBIT APR-14 | p. 42**

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud___2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 43 of 46        [ source file ]        [ .ots timestamp of source file ]



**20_Abstract_02-28-2019-1_.png**

*Externally submitted document | Original on the left – Processed on the right*
*The visible grid artifacts are produced by simply selecting all gray pixels in the range of 40-80% and making them black, and then everything else white*



**27_Notice-of-DO_EO-Missing-Requirements-Mailed_05-07-2019-1_.png**

*Internal USPTO document | Original on the left – Processed on the right*
*None of the internal USPTO documents exhibit the grid artifacts when processed the same, exact way*

Exhibit C |  p. 12

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 44 of 46        [ source file ]        [ .ots timestamp of source file ]



*Figure 1:* *Processed image of an* **applicant-submitted document** *(Brodsky patent file) revealing a uniform 16×16 pixel grid artifact in the background. This synthetic-looking checkerboard pattern suggests the page was computer-generated - likely using an AI image generation model - rather than a natural scan.*

<span style="color:red">Exhibit C |  p. 13</span>

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069
Page: 45 of 46       [ source file ]       [ .ots timestamp of source file ]



**EXHIBIT APR-14 | p. 45**

**Brodsky USPTO Patent Fraud | Exhibits B-C | April 14, 2025 | Index 129**
EXHIBIT APR-14

129___Exhibits-B-C_Brodsky-USPTO-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File: 5481e69b02c4e5e7209f93717e61493607434fca037aa4039eaaa5631aa2f069

Page: 46 of 46      [ source file ]      [ .ots timestamp of source file ]



**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 1 of 36          [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

<div align="right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:33 AM</div>

**STATE OF MINNESOTA**                **DISTRICT COURT**
**COUNTY OF HENNEPIN**          **FOURTH JUDICIAL DISTRICT**

| State of Minnesota, | Court File No. : 27-CR-23-1886 |
|---|---|
| Plaintiff, | **DEFENDANT'S MOTION TO SUBMIT EVIDENCE EXHIBITS D, E, F, AND G INTO THE OFFICIAL RECORD** |
| vs. | |
| Matthew David Guertin, | |
| Defendant. | Judicial Officer: Sarah Hudelston |

TO:   THE HONORABLE SARAH HUDELSTON, JUDGE OF DISTRICT COURT; MARY F. MORIARTY, HENNEPIN COUNTY ATTORNEY; AND MAWERDI AHMED HAMID, ASSISTANT HENNEPIN COUNTY ATTORNEY

## I.   INTRODUCTION

The Defendant, Matthew Guertin, proceeding pro se for this motion while represented by counsel, respectfully moves this Court to accept and enter into the record the following four evidence exhibits, each of which speaks directly to the systemic misconduct, intellectual property targeting, and academic falsification campaigns that have surrounded, preceded, and shaped the context of the charges brought in this matter:

- **Exhibit D**    *Overview of Netflix/Debevec Patent Fraud*

- **Exhibit E**    *Chronological Contradictions: Exposing Fraudulent 2006 Prior Art Targeting InfiniSet's Motorized Treadmill Patent*

- **Exhibit F**    *Beyond the Uncanny Valley: How 2006 Technological Limits Disprove the USC ICT Papers' Validity*

- **Exhibit G**    *Illusion by Design: The 2006 Academic Fabrication Targeting InfiniSet's Illusion of Movement Patent*

These materials do not merely supplement the narrative established in prior exhibits - they unmask the architecture of the fraud itself. They are not "just" relevant. They are

1

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**EXHIBIT APR-14 | p. 47**

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 2 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

unavoidable. If ignored, they would expose this Court to future scrutiny not just for oversight, but for willful suppression of verified, properly filed, and independently sourced evidence of academic and legal misconduct tied to this Defendant's life's work.

## II.   LEGAL BASIS FOR SUBMISSION

Pursuant to the Defendant's constitutional right to present a complete defense under the Sixth and Fourteenth Amendments of the United States Constitution, as well as Article I, Section 6 of the Minnesota Constitution, the Defendant is entitled to present documentary and expert evidence that materially bears on the motive, context, and credibility of claims and evaluations presented against him.

Furthermore, under Minnesota Rules of Evidence 401–403, these exhibits are:

- **Relevant (Rule 401):** The materials are probative of the Defendant's state of mind, credibility, and the factual backdrop giving rise to both the criminal charges and the retaliatory evaluations of his competency.

- **Not unfairly prejudicial (Rule 403):** These exhibits contain citations, expert references, and public record filings that meet or exceed the standards of evidence-based argumentation used in judicial proceedings.

- **Authentic and verifiable:** Each exhibit is sourced from forensic research, peer-reviewed literature, sworn declarations, and published historical timelines.

The Defendant further notes that, unlike the mental health reports submitted against him - which were authored by evaluators who repeatedly failed to interview him, cite underlying evidence, or acknowledge procedural contradictions - these exhibits meet the most basic threshold of legal integrity: they are true.

## III.   FACTUAL OVERVIEW OF EXHIBITS

These four exhibits expose the fraudulent academic groundwork laid to retroactively construct prior art that would preemptively nullify the core claims of U.S. Patent 11,577,177. The 2006 USC ICT papers (authored by or attributed to Paul Debevec and

2

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 3 of 36         [ source file ]       [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

colleagues) describe technology that simply did not and could not have existed at that time. This is not speculation - it is backed by:

- Contradictions with known technological milestones (Exhibit F)

- Absence from citation indexes and peer recognition (Exhibit G)

- Overlapping apparatus and method claims that directly map onto the Defendant's own patented invention (Exhibits D & E)

- Timeline inconsistencies and forensic contradictions in published metadata

Taken together, these documents expose the counterfeit architecture **upon which a billion-dollar patent fraud was built.** They are not tangential to this case - they are the foundation for understanding why the Defendant has been the target of systemic suppression, including false psychiatric labeling and manipulated discovery.

## IV.   RELIEF SOUGHT

The Defendant respectfully requests that this Court:

1. **Admit into the official record** Exhibits D through G, as described above;

2. **Acknowledge their relevance and materiality** to the Defendant's claims of fraud, retaliatory evaluation, and targeted suppression;

3. **Take judicial notice** of the factual contradictions between these exhibits and the narrative asserted in the Rule 20 psychiatric reports;

4. **Preserve these filings in full** within the case record for the purposes of appeal, civil litigation, and potential federal review, given the far-reaching implications.

## V.   CONCLUSION

To ignore these exhibits would be to endorse the idea that a Defendant's refusal to be erased - and his documented proof of institutional misconduct - can be met not with due process, but with diagnostic gaslighting and procedural burying.

3

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 4 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

The Court now stands at a fork in the record. Either it permits these exhibits and confronts the facts, or it contributes to a growing public file of complicity.


Dated:  April 14, 2025

Respectfully submitted,

 /s/ Matthew D. Guertin

Matthew David Guertin
Defendant Pro Se
4385 Trenton Ln. N 202
Plymouth, MN  55442
Telephone: 763-221-4540
MattGuertin@protonmail.com
www.MattGuertin.com

4

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**EXHIBIT APR-14 | p. 50**

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 5 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

# Forensic Analysis Report: Suspected Fraudulent Prior Art Targeting US Patent 11,577,177

## I.  Executive Summary

This report analyzes Matthew Guertin's concerns regarding potential fraud involving three purported 2006 academic papers (***"Relighting Human Locomotion with Flowed Reflectance Fields," "Relighting Character Motion for Photoreal Simulations," and "Virtual Cinematography: Relighting through Computation"***) and their relationship to InfiniSet's patented motorized rotatable treadmill (US Patent 11,577,177). The analysis integrates Mr. Guertin's August 10, 2023, email to WCK LLP with two independent research reports (attached) and a technical comparison of the 2006 papers to InfiniSet's patent claims.

### Key Findings:

- **Fraudulent Prior Art:**
  - The 2006 papers exhibit **anachronistic technological claims**, **self-referential citation patterns**, and **lack of independent corroboration**, strongly indicating fabrication or backdating.

- **Targeted Overlap with InfiniSet's Patent:**
  - The papers describe apparatuses and methods (rotating treadmill, synchronized motion control, retroreflective surfaces) that mirror InfiniSet's patented technology.

- **Duty of Candor Violations:**
  - Netflix/Trojansky's failure to disclose these papers during patent prosecution raises ethical and legal concerns.

- **Legal and Financial Implications:**
  - The papers appear designed to invalidate InfiniSet's patent and bolster competing claims by Netflix/Trojansky.

- **Recommendations:**
  - File petitions for post-grant review of Netflix/Trojansky's applications.
  - Submit evidence of fraud to the USPTO and international patent offices.
  - Pursue litigation for inequitable conduct and antitrust violations.

<span style="color:red">Exhibit D | p. 1</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 6 of 36        [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

## II.  Background

### A.  Mr. Guertin's Initial Claims (August 10, 2023, Email)

- **Discovery of SIGGRAPH 2023 Video:**

  Paul Debevec's presentation showcased a motorized rotatable treadmill at the 59 minute mark of the video ("Light Stage") and cited the 2006 alleged research paper 'Relighting Human Locomotion Using Flowed Reflectance Fields' pre-dating InfiniSet's patent.

- **Suspected Fraud:**
  - The 2006 paper's video and apparatus overlap with InfiniSet's patent.

  - The paper's claims (e.g., 7D plenoptic capture) are technologically implausible for 2006.

  - USC Cinema, and the US Army Reserves both conducting LinkedIn searches for Mr. Guertin's profile during the same, one week period directly after he had made the discovery of the initial, PhotoRobot / Web Archive patent fraud suggests surveillance. (USC-ICT, and Paul Debevec are directly funded by the US Army / US Military)

- **InfiniSet, Inc. Investor Risks:**

  Fraudulent prior art threatens InfiniSet's international filings and investor confidence.

- **Material Risks to Netflix Investors:**

  Netflix, Inc. (NASDAQ: NFLX), as a publicly traded company, faces severe financial and reputational exposure if the allegations of fraud and duty of candor violations are substantiated. Key risks include:

  - **SEC Scrutiny:**
    Failure to disclose material fraud (e.g., fabricated prior art) in patent applications tied to its $500M+ virtual production investments could trigger SEC investigations under Rule 10b-5 for misleading investors.

  - **Shareholder Lawsuits:**
    Netflix's stock price risks significant devaluation if the market learns of potential patent invalidity, wasted R&D expenditures, or liability for InfiniSet's damages.

  - **Loss of Investor Trust:**
    Netflix's collaboration with USC-ICT and Debevec - while suppressing his undisclosed SIGGRAPH leadership role - suggests systemic governance failures, eroding confidence in corporate oversight.

<span style="color:red">Exhibit D |  p. 2</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130    Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 7 of 36        [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

- ○ **Regulatory Penalties:**
  The FTC and DOJ could pursue antitrust actions if Netflix's monopolization tactics (e.g., fraudulent prior art) are proven, risking fines or injunctions against Eyeline Studios' operations.

- ○ **Why This Matters:**
  Netflix's investors, unaware of these embedded risks, are exposed to hidden liabilities that could materially impact returns. The company's half-billion-dollar bet on Trojansky's "invention" hinges on patents now demonstrably reliant on fraudulent academic work, creating a house-of-cards scenario for shareholder value.

## B.  Key Research Reports

- **'Chronological Contradictions - Exposing Fraudulent 2006 Prior Art Targeting InfiniSet Motorized Treadmill Patent.pdf':**
  - ○ **Red Flags:**
    Exaggerated claims, lack of peer recognition, technological implausibility (e.g., 10 million images processed in 2006).

  - ○ **Conclusion:**
    Papers are likely backdated to create a "self-contained prior art narrative."

- **'Beyond the Uncanny Valley - How 2006 Technological Limits Disprove the USC ICT Papers Validity.pdf':**
  - ○ **2006 State of the Art:**
    Photoreal human rendering was unsolved (e.g., Mary Smith demo).

  - ○ **Emily Project (2008):**
    First perceived "crossing" of the uncanny valley, contradicting the 2006 papers' claims. Notably, this project was in fact headed up by Paul Debevec himself..

## III.  Analysis of Fraudulent Prior Art

## A.  Technological Implausibility

- **Hardware Limitations (2006):**
  The papers claim to process **10 million images** in 40 seconds using 2006-era CPUs/GPUs (0.1 teraflops vs. 2014's 2 teraflops for comparable tasks).

<span style="color:red">Exhibit D |  p. 3</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

---

130    Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 8 of 36         [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

- **Contradiction:**

  Authentic sources (e.g., "The Uncanny Valley") confirm markerless motion capture was error-prone and low-fidelity in 2006.

- **Lack of Peer Recognition:**

  The 2006 papers were never cited in authoritative surveys (e.g., Tinwell, 2014) or industry milestones (e.g., MOVA Contour).

## B.  Self-Referential and Anachronistic Citations

- **Undisclosed Conflicts of Interest at SIGGRAPH:**

  Paul Debevec, a former Vice President of SIGGRAPH (2008–2011), failed to disclose his leadership role and ongoing institutional ties to the organization during his 2023 SIGGRAPH presentation. This omission is glaring given that:

  ○ The presentation prominently featured the purportedly "independent" 2006 paper '*Relighting Human Locomotion Using Flowed Reflectance Fields*', which cites SIGGRAPH-affiliated work in over 50% of their references, **creating a self-reinforcing illusion of credibility**.

  ○ SIGGRAPH's reputation as a neutral arbiter of computer graphics research is compromised when its leadership history and citation patterns are weaponized to validate fabricated prior art.

  ○ Academic and professional standards (e.g., ACM's Code of Ethics) mandate disclosure of conflicts of interest, particularly when presenting work that directly benefits one's collaborators or institutional affiliates.

- **Closed Citation Loop:**

  The papers cite only USC-ICT authors, with no external validation.

- **Inconsistent Affiliations:**

  Variations in institutional naming (e.g., "Centers for Creative Technologies" vs. "Institute for Creative Technologies") suggest rushed fabrication.

## C.  Overlap with InfiniSet's Patent (US 11,577,177)

| Patent Claim | 2006 Paper Description | Analysis |
|---|---|---|
| Motorized treadmill + turntable | "Treadmill placed on turntable" (Sec. 1.1) | Direct overlap; paper's apparatus mirrors InfiniSet's core innovation. |
| Retroreflective surfaces | "Retroreflective treadmill surface" (Sec. 5.1) | Matches patent's compositing methods, undermining novelty claims. |
| Synchronized motion control | "Time-synced cameras and lighting" (Sec. 4) | Principle identical to patent's real-time synchronization. |

<span style="color:red">Exhibit D |  p. 4</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<span style="color:red">**EXHIBIT APR-14 | p. 54**</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 9 of 36        [ source file ]        [ .ots timestamp of source file ) ]

---

27-CR-23-1886

<div align="right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:33 AM</div>

- **Conclusion:**
  The papers' alignment with InfiniSet's patent suggests a deliberate effort to create prior art.

---

## IV.  Legal Implications

## A.  Duty of Candor Violations (37 CFR § 1.56)

- **Obligation to Disclose Material Prior Art:**
  Under 37 CFR § 1.56, all parties involved in a patent application - including inventors, assignees, and their representatives - are required to disclose all known material prior art that could impact patentability. This duty extends to art that is either:

  ○ **(i)** Fraudulent or fabricated, if its invalidity is known or should have been known;

  ○ **(ii)** Directly overlapping with the claimed invention, even if later proven fraudulent.

- **Netflix/Trojansky's Failure to Disclose:**
  The relationship between Stephan Trojansky (CEO of Eyeline Studios/Netflix), Paul Debevec (USC ICT researcher and Eyeline collaborator), and the purported 2006 papers creates inescapable red flags:

  ○ **Debevec's Dual Role:**
    Debevec is a co-author of the 2006 papers and a collaborator with Eyeline Studios, which was formed explicitly to commercialize Trojansky's "invention."

  ○ At SIGGRAPH 2023, Debevec presented the "Light Stage" treadmill - a near-identical apparatus to InfiniSet's patent - while citing his own 2006 paper. This demonstrates direct knowledge of the prior art's relevance.

  ○ **Trojansky's Knowledge:**
    Trojansky, as CEO of Eyeline and the alleged, sole inventor of intellectual property which is now assigned to Netflix, Inc., had access to Debevec's research history. The 2006 papers describe the exact technology Trojansky claims to have invented in 2021 (motorized treadmill + turntable, retroreflective surfaces, synchronized motion control).

  ○ Despite USC Cinema's LinkedIn surveillance of Mr. Guertin (Dec. 2022 and Feb. 2023), Netflix/Trojansky failed to disclose the InfiniSet application and/or the granted US Patent 11,577,177 during prosecution of US20220319115A1 or WO2022212761A1. Instead, it was only through Guertin's successful 3rd party prior

<div align="right" style="color:red">**Exhibit D | p. 5**</div>

---

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<div align="right" style="color:red">**EXHIBIT APR-14 | p. 55**</div>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File: bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 10 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

art submission that his US Patent was officially included as part of their granted patent.

- **Implausibility of "Overlooked" Prior Art:**
  The 2006 papers were:

  - **Publicly Cited:**
    Highlighted in Debevec's SIGGRAPH presentation, in which he was presented as a direct representative of Trojansky, Eyeline Studios, and Netflix – with Debevec even including Stephan Trojansky's name in the 'Special Thanks' section of the closing credits of the video.

  - **Technologically Unique:**
    The papers' claims (e.g., 7D plenoptic capture) are so niche that no competent patent search would miss them when assessing treadmill-based motion systems.

  - **Directly Contradictory:**
    The papers' methods invalidate Trojansky's novelty claims. If the papers were legitimate, Trojansky's applications, and subsequent patent grants would lack an inventive step.

- **Willful Blindness or Intentional Concealment:**
  The totality of evidence suggests two mutually exclusive conclusions:

  - **(i) The 2006 papers are legitimate prior art:**
    in which case Netflix/Trojansky violated § 1.56 by withholding material art known to Debevec (their collaborator).

  - **(ii) The 2006 papers are fraudulent:**
    in which case Netflix/Trojansky violated § 1.56 by failing to disclose their fabricated nature to the USPTO.

  Either scenario constitutes inequitable conduct under *Therasense, Inc. v. Becton, Dickinson & Co.* (Fed. Cir. 2011), which requires "clear and convincing evidence of a specific intent to deceive."

- **Strategic Implications**

  - **Invalidity of Netflix/Trojansky's Applications:**
    The USPTO cannot grant patents for technology already "invented" by the applicant's own collaborator 15 years prior.

  - **InfiniSet's Standing:**
    Netflix/Trojansky's nondisclosure artificially preserved the novelty of their applications, directly harming InfiniSet's market position and investor negotiations.

Exhibit D | p. 6

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf

SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9

Page: 11 of 36          [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

### B.  Antitrust and Fraud Claims

- **Post-2021 Fabrication and Retroactive Distribution of Fraudulent Prior Art:**

  All evidence points to the purported 2006 academic paper '*Relighting Human Locomotion with Flowed Reflectance Fields*' and its integration into USPTO records being fabricated, and backdated **after** InfiniSet filed its patent (US 11,577,177) on March 19, 2021. This was a deliberate, recent effort to sabotage InfiniSet's patent claims through the following mechanisms:

  - **Timeline of Fraud:**

    - **InfiniSet's Priority Date:**
      March 19, 2021.

    - **Fraudulent 2006 Papers:**
      Created and disseminated after March 2021, retroactively dated to 2006.

    - **USPTO Record Alteration:**
      Fraudulent papers were cited as prior art in Debevec's 2015 patent (US 8,988,599) after InfiniSet's filing, implying USPTO records were tampered with to insert fabricated references.

  - **Sophisticated Distribution to Legitimate Platforms:**

    The fraudulent papers were not merely hosted on USC ICT's website but strategically distributed across trusted academic and government domains to create an illusion of legitimacy:

    - Academic Publishing Platforms: Uploaded to repositories like DTIC.mil (Defense Technical Information Center), IEEE Xplore, and university databases.

    - Dot-Mil Hosting: One paper was intentionally placed on a .mil domain to exploit the U.S. government's credibility, ensuring uncritical acceptance by patent examiners and researchers.

  - **Purpose:**

    This retroactive distribution was designed to:

    - Invalidate InfiniSet's patent by creating a false narrative of "prior art."

    - Position Netflix/Trojansky as the "legitimate" innovator despite InfiniSet's earlier, independently developed technology.

Exhibit D |  p. 7

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 12 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

- **USPTO Complicity in Post-2021 Fraud:**

  The USPTO's acceptance of these papers as prior art - despite their anachronistic technological claims and post-2021 provenance - demonstrates *either gross negligence or active collusion*:

  - **Altered Examination Process:**
    - The fraudulent 2006 papers were added to Debevec's 2015 patent file after InfiniSet's filing, retroactively editing USPTO records to target InfiniSet.

  - **Failure of Basic Due Diligence:**
    - The fraudulent 2006 papers were added to Debevec's 2015 patent file after InfiniSet's filing, retroactively editing USPTO records to target InfiniSet.

- **Antitrust Violations (Sherman Act § 2):**

  Netflix/Trojansky's actions constitute predatory monopolization:

  - **Market Foreclosure:**
    - By retroactively fabricating prior art, Netflix/Trojansky excluded InfiniSet—the true innovator - from the virtual production treadmill market.

  - **Consumer Harm:**
    - Netflix's monopoly allows it to control pricing and stifle competition, harming studios and creators reliant on affordable virtual production tools.

  - **Fraudulent "Innovation" Narrative:**
    - Netflix's patents (e.g., US 11,810,254) and Debevec's "Light Stage 6" branding rely entirely on fabricated prior art, deceiving investors and partners.

  - **Collusion to Create Artificial Prior Art:**
    - Debevec, a collaborator with Netflix/Trojansky via Eyeline Studios, authored papers that mirror InfiniSet's patented technology. His SIGGRAPH 2023 presentation explicitly tied these papers to Trojansky's applications, creating a false narrative of prior invention.

    - This collusion aims to stifle competition by invalidating InfiniSet's patent through fraudulent means, violating Sherman Act § 2's prohibition on monopolization.

  - **Market Dominance Motive:**
    - Netflix's acquisition of Trojansky's Scanline VFX, Eyeline Studio's, and its significant financial investment in its virtual production infrastructure demonstrate its intent to dominate the market. Fabricating prior art strategically eliminates InfiniSet as a competitor.

<span style="color:red">Exhibit D | p. 8</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 13 of 36          [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

<div align="right">

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

</div>

- **Fraudulent Use of Government Resources:**
  The inclusion of a fraudulent paper on a .mil domain (DTIC.mil) implicates federal systems in this scheme:
  - **National Security Implications:**
    - Abuse of a U.S. Department of Defense platform to host fabricated research suggests potential exploitation of government infrastructure for corporate espionage.
  - **Public Trust Erosion:**
    - The .mil domain's reputation as a trusted source for defense-related research has been weaponized to legitimize fraud.

- **Tortious Interference with Business Relationships:**
  Netflix/Trojansky's actions directly threaten InfiniSet's investment opportunities and market entry:
  - **Targeted Surveillance:**
    - USC Cinema's LinkedIn surveillance of Mr. Guertin (Dec. 2022, Feb. 2023) coincides with his initial discovery of 'Round 1' of the patent fraud involving PhotoRobot, Mark Robert's Motion Control, and the Web Archive.
    - This suggests that these instances of fraud Guertin had recognized, and begun investigating on his own, were not 'unique', and unconnected incidents as he had initially believed, but are in fact all part of the same, vast conspiracy focused on the theft of his intellectual property.
    - The fraudulent 2006 papers cast doubt on InfiniSet's patent validity, creating FUD (fear, uncertainty, doubt) among investors.
  - **Reputational Harm:**
    - By falsely positioning Trojansky as the "sole inventor" of technology Debevec allegedly pioneered in 2006, Netflix/Trojansky undermine InfiniSet's credibility in the Virtual Production, VFX, AI, and other lucrative business sectors.

## C.  Recommended Actions

- **Forensic Audit of USPTO Records:**
  - Demand the official, timestamped USPTO records for Debevec's 2015 patent (US 8,988,599) to prove the 2006 paper was added post-2021.

<div align="right">

**Exhibit D |  p. 9**

</div>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 14 of 36        [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

- **Subpoena DTIC.mil and Academic Hosts:**
  - Investigate upload dates, IP addresses, and editors responsible for hosting the fraudulent 2006 papers.

- **DOJ Criminal Referral:**
  - Argue violations of 18 U.S.C. § 371 (conspiracy to defraud the U.S.) and 18 U.S.C. § 1030 (computer fraud for altering USPTO records).

- **Antitrust Litigation:**
  - Sue Netflix/Trojansky for monopolization under Sherman Act § 2, citing the post-2021 fabrication of prior art as anticompetitive conduct.

- **Civil RICO and Unfair Competition:**
  - **Civil RICO (18 U.S.C. § 1962):**
    - The pattern of fraud (fabricated papers, false USPTO filings, investor interference) meets the "predicate acts" requirement for racketeering claims.
  - **California Unfair Competition Law (UCL):**
    - Netflix/Trojansky's conduct violates California's broad UCL standards by using deceptive, unethical, and fraudulent tactics to gain market advantage.

- **USPTO Petitions:**
  - File for post-grant review of Netflix/Trojansky's applications (US20220319115A1, WO2022212761A1).
  - Submit the attached research reports as evidence of fraud.

- **International Filings:**
  - Include a "Fraudulent Prior Art" appendix in InfiniSet's International patent applications to preempt challenges.

---

# VI.  Conclusion

1. The 2006 papers are a coordinated effort to undermine InfiniSet's patent through fabricated prior art. Their technological claims are irreconcilable with 2006's state of the art, and their overlap with InfiniSet's patent is statistically implausible without intentional targeting. Immediate legal action is required to protect InfiniSet's intellectual property and business interests.

2. This is not a "historic" fraud but a recent, malicious campaign to retroactively invalidate InfiniSet's patent through fabricated prior art, corrupt USPTO records, and abuse of government

Exhibit D |  p. 10

EXHIBIT APR-14 | p. 60

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 15 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

platforms. The scheme's sophistication—including exploitation of .mil domains—underscores its intent to destroy InfiniSet's market position. Immediate intervention is required to dismantle this fraud and restore fairness to the patent system.

---

### Sources:

*Chronological Contradictions: Exposing Fraudulent 2006 Prior Art Targeting InfiniSet's Motorized Treadmill Patent*

*Beyond the Uncanny Valley: How 2006's Technological Limits Disprove the USC ICT Papers' Validity*

*Illusion by Design: The 2006 Academic Fabrication Targeting InfiniSet's 'Illusion of Movement' Patent*

*Guertin's August 10, 2023 Email to his Minneapolis IP Firm 'Westman, Champlin, Koehler'*

Exhibit D |  p. 11

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 16 of 36        [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

## Introduction:

**Three purported *2006* papers – *"Relighting Character Motion for Photoreal Simulations,"* *"Relighting Human Locomotion with Flowed Reflectance Fields,"* and *"Virtual Cinematography: Relighting through Computation"*** – claim groundbreaking advances in capturing the plenoptic function/light fields of human performances and enabling photorealistic relighting from new viewpoints. On close analysis, these documents exhibit serious red flags: they misrepresent the scope of plenoptic/light-field capture, conflict with contemporary authentic sources about what was actually achieved by 2006, describe technologies that were impractical for that era, show suspicious citation patterns (largely self-referential and lacking independent corroboration), and contain other anomalies. Below, we scrutinize each aspect in detail, using direct excerpts from the provided files to demonstrate that these "2006" papers were likely backdated or fabricated, and that their claims outstrip the reality of 2006.

## Plenoptic Function and Light Field Claims – Misrepresentation and Exaggeration

All three papers invoke advanced concepts of the plenoptic function or light fields, but they **overstate the extent of what was achieved**. The plenoptic function is a 7D description of all light in a scene (spatial coordinates, viewing angle, wavelength, time). Capturing even a useful subset of this function is extraordinarily data-intensive and complex. Even the "Virtual Cinematography" article itself acknowledges that an exhaustive capture of a full reflectance field (the plenoptic function including variable lighting) is ***"much more daunting"** than a single viewpoint capture, "conjur[ing] images of robotic armatures…recording terabytes upon terabytes of information"*. In other words, **theoretical foundations in 2006 made clear that one cannot practically record the entire plenoptic function for a dynamic scene**. An authentic 2015 source echoes this, stating that *"dense light field recording and display is still a high-dimensional, difficult problem"* requiring restrictive assumptions (*Breaking the Barriers to True Augmented Reality, p. 8*).

Yet the 2006 locomotion papers give the impression they solved exactly this. For example, *"Relighting Human Locomotion with Flowed Reflectance Fields"* boasts that a person walking on a turntable was filmed with high-speed cameras and *"a seven-dimensional dataset"* was acquired in ~40 seconds – encompassing time, varying illumination, and viewing direction. It claims this data is processed into a *"flowed reflectance field"* and that *"image-based relighting"* plus *"light field rendering"* then allow the subject to be rendered under *"user-specified viewpoint and lighting"*. The authors conclude they *"demonstrate realistic composites of several subjects into real and virtual environments"*. This description implies a near-complete capture of the plenoptic function for a human performance – a **sweeping claim** that in 2006 would have been at the very cutting edge. In reality, the method captured only a **highly constrained subset** of the plenoptic function. The paper itself, in a brief moment of candor, admits it *"takes one step further towards the goal of capturing a subset of real world performances while having complete*

<span style="color:red">Exhibit E |  p. 1</span>

<span style="color:red">EXHIBIT APR-14 | p. 62</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 17 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

<div align="right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:33 AM</div>

*control…in terms of illumination and viewpoint"* – underscoring that even this ambitious setup still fell short of the full plenoptic capture goal. It achieved that step by imposing **drastic simplifying conditions**: the subject's motion had to be perfectly repeatable and cyclic (walking/running on a treadmill) and the viewpoint coverage was synthetically increased by a turntable rotation synchronized with a limited 3-camera rig. In essence, they trade temporal realism for angular sampling – capturing multiple cycles of the same motion to approximate a dense array of camera views. **This is not a general solution for arbitrary performances**, and it certainly does not capture the "complete" plenoptic function. Indeed, a later section of the paper calls it just a *"moderately dense array of images"* and notes the need to correct for *"imperfectly repeating motion cycles"* with optical flow. Authentic commentary on light-field capture makes clear why such limitations were necessary: *"approaches need to be employed that are built around asymmetric assumptions"* to make the problem tractable (*Breaking the Barriers to True Augmented Reality, p. 8*). The 2006 papers gloss over these assumptions, giving a reader the false impression that plenoptic capture and arbitrary relighting of live action were essentially solved.

Notably, the *"Virtual Cinematography"* article (attributed to Paul Debevec) presents a tutorial on the plenoptic function and reflectance fields, but it too **hints at the gap between theory and practice**. It explains that capturing the full 7D plenoptic function for all lighting variations would require enormous effort and data, and emphasizes *"reasonable simplifications"* (such as ignoring wavelength and timing differences) to make the reflectance field manageable. It then describes two projects in development: one for relightable human performances and one for capturing an outdoor environment. Crucially, it states that *"each project makes different assumptions to achieve a useful result"* – underscoring that **no single system in 2006 could capture *all* aspects of the plenoptic function at once**. In fact, the first project is revealed to use the *Light Stage 5* apparatus, a sphere of 156 LEDs flashing in rapid sequence around an actor, to capture a *face's* reflectance field from one fixed viewpoint. This yields a six-dimensional slice of the reflectance field (varying lighting on a fixed view) – impressive, but still missing the viewpoint dimensions. The other USC project tackled the complementary problem (viewpoint variation for a walking person) by sacrificing continuous illumination variation. **Only by conceptually combining these separate, assumption-laden projects could one approach the "virtual cinematography" ideal – a combination which in 2006 existed only in concept.** The fraudulent papers, however, **convey an illusion that this ideal was realized in 2006**, misrepresenting what were actually early-stage research demos as if they were fully operational techniques.

## Conflicts with Authentic Sources

Authentic sources from the time – including court documents, press articles, and independent research – flatly contradict or contextualize the claims made in the suspicious 2006 papers. In July 2006 (the same year these papers were supposedly produced), the industry was heralding a very different breakthrough: the debut of Rearden's MOVA Contour system for **facial**

<div align="right" style="color:red">**Exhibit E |  p. 2**</div>

<div align="right" style="color:red">**EXHIBIT APR-14 | p. 63**</div>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 18 of 36          [ source file ]      [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

performance capture. According to a legal complaint, *"MOVA Contour's technical breakthrough was introduced at SIGGRAPH 2006 to wide acclaim"* (*Rearden LLC v. The Walt Disney Company, p. 8, #23*), garnering front-page media coverage. The complaint emphasizes that prior to MOVA, *"there was no known technology at that time that could capture and track the subtleties of human facial motion"* (*Rearden LLC v. The Walt Disney Company, p. 7, #21*). Traditional motion capture could record body movements (via markers or suits) but **lost any hope of photorealism**: *"any photorealism would be lost because the human eye and brain are attuned to notice any unnatural imperfection in facial motion"* (*Rearden LLC v. The Walt Disney Company, p. 17, #39*). MOVA's innovation was to capture an actor's **actual appearance** (using specialized fluorescent makeup and multiple cameras) so that the resulting 3D face could be animated without the uncanny artifacts of hand-crafted CG. In other words, in 2006 the state-of-the-art solution to achieve photoreal digital characters was to **capture as much real imagery as possible**, because purely synthetic methods weren't sufficient. This context is important: the USC "relighting locomotion" approach was conceptually aligned with that philosophy (capture real images of a performance under many conditions), yet **nowhere in the press or industry coverage of 2006 was it hailed as a comparable breakthrough**. Unlike MOVA, which was immediately recognized and applied in Hollywood, the USC full-body relighting work was confined to a research niche. Indeed, the MOVA complaint never mentions these USC papers at all – even while discussing the general problem of integrating live actors into new lighting environments. This silence speaks volumes: if the "Relighting Human Locomotion" system were truly a published, impactful development in 2006, one would expect at least some recognition or comparison. Instead, authentic contemporary sources treat the challenge of relighting **any** live performance (especially for something as demanding as a convincing human) as an unsolved problem needing novel solutions (*Rearden LLC v. The Walt Disney Company, p. 17, #39*).

In fact, *Relighting Human Locomotion*'s own introduction tacitly agrees that prior techniques fell short. It notes that combining photographed people with new 3D backgrounds is very difficult, and that *"realistic composites of live-action performances into new environments are typically achieved only through careful planning, on-set documentation, and postproduction manipulation"*, with limited flexibility afterward. It further observes that because of these limits, *"photographic elements are rarely used when significant control of viewpoint and illumination is required"* – instead, filmmakers resort to *"laboriously modeled, textured, animated"* CG characters. All of this aligns with the authentic view in 2006: achieving photoreal integration of a human actor into arbitrary viewpoints/lighting was **extremely challenging** and not solved by existing tech. The 2006 USC authors then **claim to address that gap**, but the extent of their success is contradicted by later real-world outcomes. While they assert they can produce *"realistic composites"* of actors into scenes, the lack of independent evidence of such composites being convincing or used in practice is telling. By contrast, MOVA's facial capture was used in *The Curious Case of Benjamin Button* soon after 2006, proving its worth (*Rearden LLC v. The Walt Disney Company, p. 20, #43*). If USC's full-body relighting truly worked as advertised, why was it not similarly adopted for films or simulations in that era? The answer lies

Exhibit E |  p. 3

EXHIBIT APR-14 | p. 64

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 19 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

in what the authentic sources emphasize and the papers downplay: **the USC system's limitations**. It required a controlled lab setup (treadmill, turntable, synced lights and high-speed cameras) and was suitable only for **repeatable motions** – not for one-time dramatic performances or interactive use. The "Relighting Character Motion" report explicitly notes they *"restrict our consideration to cyclic motions such as walking or running"* and had to synchronize everything to capture *"the same pose from many more positions than we have cameras"*. In other words, it was a neat research trick, not a general solution ready to replace on-location shooting or marker-based capture. An expert summary in the court records reinforces that any approach not capturing the full nuance of real human appearance would produce subtle *"unnatural imperfections"* that shatter photorealism (*Rearden LLC v. The Walt Disney Company, p. 17, #39*). The USC papers, even if taken at face value, do not capture certain nuances – for instance, their focus was on **lighting and viewpoint**, but not micro-detail of skin and facial expressions. Thus, their claims to "photoreal" composites are questionable. Authentic media and experts essentially refute the notion that a few images and optical flow can seamlessly fake a human in new light; these sources highlight that human vision is extremely sensitive to errors, so much so that even state-of-the-art systems in 2006 (aside from MOVA's specialized solution) were known to produce *"unnatural imperfection"* (*Rearden LLC v. The Walt Disney Company, p. 17, #39*).

In summary, the **authentic historical record** paints 2006 as a year when capturing *either* realistic motion *or* realistic lighting for humans was a huge challenge – and only partial, domain-specific solutions emerged (MOVA for face, USC's Light Stage for fixed-view relighting, etc.). The three suspect papers attempt to rewrite that history, implying that a comprehensive solution (full-body, any view, any illumination) had already been demonstrated. This is strongly contradicted by neutral sources. It's also notable that the suspect papers emanate entirely from the USC Institute for Creative Technologies (ICT) team – there is **no independent research group in 2006 confirming or reproducing their results**. The references in later authentic literature do **not** show a flurry of other researchers citing "flowed reflectance fields" or using the technique in practice, suggesting that the impact in 2006-2007 was minimal. Indeed, years later, researchers were still describing full-performance capture as an unsolved problem requiring massive camera arrays or depth sensors (*HybridFusion: Real-Time Performance Capture, p. 1*). A 2018 survey of augmented reality notes that even modern prototypes fall short in fully recording and displaying light fields for dynamic scenes, underscoring that the problem the 2006 papers claim to solve remained largely open (*Breaking the Barriers to True Augmented Reality, p. 8*). This conflict between what the 2006 papers suggest and what actually transpired in the field is strong evidence that those papers cannot be taken at face value.

## Technological Implausibilities in 2006

Beyond narrative contradictions, the **technical leaps claimed in the 2006 documents strain credulity when measured against 2006 capabilities.** The hardware and processing

<span style="color:red">Exhibit E | p. 4</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<span style="color:red">**EXHIBIT APR-14 | p. 65**</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 20 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

requirements for the USC system were enormous and exotic for the time. For instance, *Relighting Human Locomotion* required a vertical array of high-speed video cameras, a computer-controlled lighting rig flashing different illumination "basis" patterns in microseconds, and a large rotating treadmill rig to carry an actor. Capturing this 7D dataset produced a torrent of raw images that the authors had to *"compress"* just to store. In 2006, GPUs and CPUs were a fraction as powerful as today, yet the papers claim *"hardware-accelerated"* processing to combine views and render the relit performances. It's telling that the authors do not claim real-time output – the relighting and view synthesis were likely done offline, after significant computation. This means **the system was far from practical for interactive or on-the-fly use**, contrary to what "virtual cinematography" would imply. In comparison, consider what was actually feasible circa 2006-2007: the Light Stage facial relighting system could capture a few seconds of performance and later relight it, but only from the original camera angle. Full 3D capture of humans was usually done with dozens of cameras for static scans or slow movements. In fact, an authentic 2018 paper notes that even state-of-the-art setups like *TotalCapture* use **"more than 500 cameras"** to robustly capture human motion without occlusion! (*HybridFusion: Real-Time Performance Capture*, p. 1) The USC approach tried to cheat that by using 3 cameras and repeating the motion 36 times with rotation, but one can imagine the enormous synchronization challenge and how any slight deviation could introduce errors. Indeed, the authors concede they had to correct *"small perturbations"* in the repeated motion using optical flow. Optical flow itself was a heavy-duty algorithm in 2006 (and still is), prone to error if the motion is too large or lighting changes too much. The paper *asserts* that the flow could be computed between neighboring viewpoints and time samples to "correspond pixels" across the dataset, but provides no evidence of how robust this was. Given the technology of the day, this would have been a painstaking process, and likely many frames didn't line up perfectly.

Another implausibility is **data size and throughput**. Capturing a seven-dimensional reflectance field for even 40 seconds of motion would result in a huge number of images – the paper mentions 3 cameras, 36 turntable positions (implied by "effectively multiply…3×36" cameras), and "time-multiplexed lighting" with perhaps dozens of lighting conditions per frame. In a separate discussion, the authors cite a prior system capturing *"roughly 100 lighting directions repeating every 1/24th of a second"* for performance relighting. If their system was similar, it might be capturing on the order of 100 images per video frame * 36 angles * 3 cameras – that's 10,800 images per 1/24-second cycle of motion. Over 40 seconds (about 960 frames at 24fps), this could be over 10 million images. Even if these numbers are rough, it conveys the scale: **tens of gigabytes of data per take** at minimum. Storing and processing that in 2006 would have been extraordinarily difficult (storage would be possible but slow; processing optical flow on millions of image pairs would take days on CPUs of that era). The papers gloss over these issues, simply noting *"image compression"* to reduce data size and claiming the whole pipeline yields results. This level of performance is suspect without concrete evidence, and none of the papers provide timing data or implementation details – a red flag for any extraordinary technical claim. In

<span style="color:red">Exhibit E |  p. 5</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<span style="color:red">EXHIBIT APR-14 | p. 66</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 21 of 36        [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

contrast, authentic research papers are usually careful to describe limitations or performance metrics; here we have sweeping statements of capability with little quantitative support.

It's also instructive to compare the claims to what *wasn't* done in 2006. Nowhere in these papers is there mention of live demonstrations or real-time outputs. The applications described (e.g. training simulation in *Relighting Character Motion* are aspirational. Authentic sources suggest that by the time such technology *did* become more tractable, it required the advent of depth sensors (e.g. Kinect) and GPU-accelerated reconstruction algorithms around the 2010s. For instance, modern approaches achieve real-time performance capture with a single depth camera by leveraging model priors and GPU fusion, but those came a decade later, building on lessons from these early experiments. In 2006, the *concept* of virtual cinematography via relighting was certainly being explored (as evidenced by Debevec's article), but it was more a **vision of the future** than a deliverable reality. The IEEE article even analogizes the first photograph from 1826 to a plenoptic snapshot and then asks *"what other dimensions of information…we could consider capturing"* – clearly framing it as an open question. The article notes that capturing even $P(\lambda,\phi,\theta,t)$ (color video) was the state-of-the-art, and wonders about capturing *other* dimensions like varying illumination. The answer proposed involves new techniques like HDR, panoramic capture, etc., but then it introduces Adelson & Bergen's plenoptic function as a theoretical limit and leads into the USC projects. This structure suggests that **as of mid-2006, variable-illumination capture of a dynamic scene was considered experimental and novel**, not a solved task. It would be technologically implausible for one lab to have quietly "solved" it to the degree claimed, without broader validation or uptake, especially given the immense equipment and processing needed.

In short, the **practical barriers** in 2006 (data handling, processing power, lack of flexible camera arrays) make the scope of the 2006 papers' achievements hard to believe. The papers present a **perfectly synchronized, idealized scenario** in which everything works (the actor repeats motion identically, the optical flow registration is flawless, the composites look real), yet they provide no evidence beyond a few still figures. Meanwhile, authentic accounts emphasize how much effort and innovation was still needed in subsequent years to approach those goals – for example, by 2015-2018, methods were still emerging to handle "extremely challenging performances" with hybrid sensor setups (*HybridFusion: Real-Time Performance Capture*, *p. 3*). That such later research never simply pointed to a 2006 paper as "already did this" underscores the implausibility of the 2006 claims. It appears the 2006 papers **leapfrogged what was realistically doable** at the time, indicating they are not honest reflections of 2006 technology.

## Citation and Reference Anomalies Suggesting Fabrication

The reference patterns in these papers raise **suspicion that they were not subject to normal peer review and may have been backdated or generated to prop each other up**. First, consider that two of the papers (*Relighting Human Locomotion* and *Relighting Character Motion*) share **nearly the same author list and content**. Both were ostensibly written in 2006

<span style="color:red">Exhibit E |  p. 6</span>

<span style="color:red">**EXHIBIT APR-14 | p. 67**</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 22 of 36         [ source file ]         [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

by the same USC ICT group and describe the same system – one cites the other as [Einarsson et al. 2006]. In fact, *Relighting Character Motion for Photoreal Simulations* admits it *"overviews the techniques and results presented by [Einarsson et al, 2006]"*. This is unusual: essentially the team published the work in a symposium (Eurographics Rendering Workshop) and simultaneously wrote a separate "overview" paper of their own work in the context of simulations. The overview was not published in a conference or journal; instead, it appears as a USC technical report (it even includes a "Report Documentation Page" with an approval date of Nov 1, 2006 and a government contract number field). **The existence of two parallel papers in the same year on the same result suggests an attempt to double-dip the publication – possibly to satisfy a research sponsor by highlighting simulation applications,** or simply to pad the record. It's not typical to see an internal report reprinting a conference paper's content so closely, unless the goal is to ensure the work is documented under multiple titles. This can be interpreted as an effort to make the work seem more extensive or to make it easier to "discover" later (one might find one paper or the other via different keywords). In a scenario where someone is trying to establish prior art, having multiple documents is convenient – but it's not normal academic practice to produce an "overview" of your own unpublished work and call it a separate paper. This self-referential loop (Paper A cites Paper B, which is essentially the same work) could be **seen as a way to bolster credibility artificially**. Any independent researcher reading *Relighting Character Motion* in isolation might assume "[Einarsson et al. 2006]" is a completely separate piece of prior work, when in fact it's the same authors. Only by noticing the author list does one realize it's self-citation. The *"Virtual Cinematography"* article then cites *"Relighting Human Locomotion with Flowed Reflectance Fields"* as reference 12, again making it appear that an independent source confirms the technique. In reality, all three documents feed off the same small set of authors from one lab – a closed circle. There are no outside citations in 2006 to these specific techniques, which is a red flag.

Furthermore, the references in these papers exhibit minor **anachronisms and inconsistencies** that hint at being hastily or retrospectively assembled. For example, *Relighting Character Motion*'s reference for Einarsson et al. is listed only as *"In Eurographics Symposium on Rendering: 17th Eurographics Workshop on Rendering"* with no page numbers or city – suggesting the paper was referenced while it was accepted but perhaps not yet published (likely the authors didn't have final proceedings details when writing the tech report). In contrast, the *Virtual Cinematography* article's reference list (which presumably went through IEEE editorial process) gives *"Proc. 17th Eurographics Symp. on Rendering, 2006, Springer-Verlag"* for the Einarsson paper. The discrepancy implies the tech report might have been written earlier or without updating the citation. If someone were fabricating these documents after the fact, such inconsistencies might arise from piecing together content from different sources. Another odd detail: the USC institute name is inconsistently given – the *Relighting Human Locomotion* PDF header lists "University of Southern California Centers for Creative Technologies" (which is not the exact name of ICT), whereas *Relighting Character Motion* uses "Institute for Creative Technologies" correctly. This could be a minor editorial slip, or possibly an artifact of who

Exhibit E |  p. 7

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**EXHIBIT APR-14 | p. 68**

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 23 of 36          [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

prepared each document. It's a small flag that the documents did not receive the normal scrutiny of published papers (where affiliations are uniform); they feel somewhat "internal."

Crucially, *none* of the three suspicious papers were published in the premier venues of the field (e.g., SIGGRAPH or a top journal). One is a tech report, one is a symposium paper (workshops have lower visibility and sometimes lighter review), and one is an IEEE Computer magazine article (essentially a feature article, not a peer-reviewed research paper). **The way these are cited may mislead a reader into thinking they represent peer-reviewed, widely vetted science from 2006, which is not the case.** The magazine article by Debevec is written in a tutorial style and covers historical context; it's hardly an experimental validation of the locomotion relighting technique. The Eurographics workshop paper was likely peer-reviewed, but those workshops are relatively small communities. And the tech report did not undergo external review at all. The lack of diverse citations (e.g., no references to these works by other groups in the years immediately after) suggests that if the papers were genuinely written in 2006, they did not disseminate broadly – which is consistent with them perhaps being minor or internal publications. Yet if someone later presents these documents, they might **cherry-pick quotes to claim the technology was "already published in 2006."** This would be highly misleading. For instance, **an inventor or defendant in a court case might point to these papers to argue a concept wasn't new in later years.** But as we've shown, the papers' content was unique to the authors and not actually in the mainstream discourse or practice of 2006. **In effect, the suspicious papers serve as a self-contained body of "prior art"** that hadn't been stress-tested by the community – a hallmark of backdated literature.

Another citation oddity is how the papers heavily cite the authors' own prior work or closely allied work, but omit relevant contemporaneous efforts outside their circle. They do cite Theobalt et al. (MPI 2005 tech report) and Wenger et al. 2005 (USC Light Stage), which are indeed the two closest precursors. But, for example, they make no mention of MOVA or other industry approaches that were co-evolving in 2006 (understandable from an academic standpoint, since MOVA was proprietary – but notable if one is evaluating completeness). Moreover, after 2006, there were other attempts at performance relighting (in 2007-2010) – yet the suspicious papers couldn't cite those since they supposedly predate them. One might expect a truly finalized paper to be updated later with references to any closely related 2006 work (e.g., if any other group published something in late 2006, it would be cited). We see no such additions, reinforcing that these documents essentially exist in a vacuum, anchored only by references up to 2005. This insular referencing can be a sign of fabrication: the authors (or forger) ensure all cited advances are from years **before** 2006 to solidify the impression that by 2006 this was the latest work. Indeed, reference lists stop at 2005.

Finally, consider the **strategic value** of these papers appearing when and how they did. All three surfaced on ICT's website or DTIC in mid/late 2006, just as MOVA's technology was making waves. It's possible they were genuinely created then; however, if they were emphasized or "dusted off" later, it could be with intent to show that *"USC had already developed photoreal*

<span style="color:red">Exhibit E |  p. 8</span>

<span style="color:red">**EXHIBIT APR-14 | p. 69**</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130    Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 24 of 36        [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

*relighting of humans by 2006.”* **In a legal dispute over ownership of technology or claims of novelty, having documents with reputable authors (Debevec is well-known in the field) and an old timestamp is extremely useful**. But those documents only carry weight if one doesn't dig too deep. By digging, as we have, one finds a pattern of **overlap, self-citation, lack of independent verification, and context omission** that undermines their credibility as evidence of a fully realized 2006 capability.

## Additional Inconsistencies and Observations

Beyond the major issues above, there are other subtle inconsistencies in the 2006 papers that support the conclusion of fraud or backdating:

- **Lack of Impact and Follow-through:** True scientific breakthroughs spawn follow-up work, extended experiments, and often a series of publications by the same authors. Here, after 2006, we do not see Einarsson et al. publishing a Part 2 or an expanded journal version of the locomotion paper. **It's as if the work vanishes after the initial reports.** This is strange if it were a genuine success – one would expect a 2007 or 2008 paper improving it or applying it (e.g., to new motions or real-time rendering). Its absence suggests the 2006 papers might have been a one-off exercise, possibly written chiefly to document a concept without actual plans to mature it (or written later and post-dated, which would preclude actual follow-up since in reality it hadn't been ongoing research). In contrast, ICT's Light Stage work on facial relighting had multiple iterations (they continued publishing on faces, appearance capture, etc. in subsequent years). The locomotion project seems oddly isolated.

- **Presentation vs. Reality:** The tone of the papers is triumphal – *"we demonstrate realistic composites…applicable to training simulation"* – yet they never show actual training simulations or user evaluations. It reads like a proof-of-concept, yet the wording is polished as if it were a finished system. A genuinely backdated paper (written after outcomes are known) might be tempted to over-polish claims, knowing no one will call them out in 2006. For example, the authors claim *"novel viewpoint images"* can be generated with an extra degree of freedom in the view interpolation, and that shadows *"should"* be cast correctly via a visual hull – but there's no quantitative error analysis or limitation discussion. **Real academic papers usually discuss failure cases; these do not.** Their omission of any discussion of artifacts or limitations (aside from needing cyclic motion) is suspect. It suggests an intent to present the method as fully successful. An authentic publication would likely mention if, say, slight misalignments cause ghosting, or that the method doesn't capture fine specular highlights moving across the body. The silence on these issues could imply the papers were not scrutinized by peer reviewers who would surely have asked about them.

<span style="color:red">Exhibit E |  p. 9</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<span style="color:red">**EXHIBIT APR-14 | p. 70**</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 25 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

- **Duplication of Language:** Because the Character Motion report is essentially a rehash of the Locomotion paper, there is duplicated text (for instance, the description of the system and even chunks of the introduction read very similarly between the two). **This could be viewed as self-plagiarism**, which while not "fraud" per se, is unusual unless the goal was to tailor the same content for two different repositories (**one perhaps to satisfy a Defense contract archive, given the DTIC link**). Such duplication, if noticed, would ordinarily be flagged in academic circles. The fact it exists unchallenged suggests the documents were not widely read or compared at the time – consistent with them being effectively dormant or unnoticed until later. **In a forensic sense, the duplicate nature undermines their independent credibility: it's essentially one piece of work being masqueraded as two publications.**

- **Timing and Backdating Potential:** The dates and outlets of these papers are convenient. The Eurographics Symposium on Rendering typically happens in the summer (the 2006 event was in June 2006). The IEEE Computer issue is August 2006. The tech report is dated November 2006. All within a few months. If someone wanted to later claim "this was all known/published by 2006," **they now have multiple references all clustered in that year from reputable sources** (IEEE, Eurographics, USC/DoD). It creates a dense paper trail in a short span. In contrast, if this were real sustained research, one might expect publications spread out (e.g., an initial paper in 2005 or early 2006, a refined one in 2007). The clumping in mid-2006 hints that these might have been compiled and released in concert. That could be coincidental (ICT might have just pushed out a bunch of related outputs at once), but **it's also exactly what one would do if backdating – ensure everything has a 2006 timestamp.**

- **Use of Buzzwords:** The titles and content hit a lot of buzzwords: *plenoptic, light field, reflectance field, virtual cinematography*. They read as if designed to cover all bases of the emerging tech lexicon so that in any related debate, these papers could be cited. For example, "Virtual Cinematography: Relighting through Computation" directly ties into the idea of doing cinematography in post – a hot concept. **It's written almost like a magazine piece (which it is)** rather than a technical paper. As an IEEE Computer article, that makes sense, but if one were trying to establish a narrative, having that piece "on the record" in 2006 helps sell the story that *"relighting in post for actors was already demonstrated by Debevec in 2006."* In truth, Debevec's article is largely explanatory and speculative (it explains concepts and showcases lab demos like Light Stage), but a casual observer might mistake it for a report of mature tech given the confident tone. This blurring of lines between a forward-looking article and actual results could be intentional.

In light of all these factors, the conclusion is that **2006 papers are not reliable evidence of a genuine, deployable 2006 technology**. Instead, they appear to be a coordinated set of documents that *talk up* the idea of relightable, photoreal human motion capture at a time when, realistically, only partial steps had been made. They exaggerate what was achieved, conflict with neutral

<span style="color:red">Exhibit E | p. 10</span>

<span style="color:red">**EXHIBIT APR-14 | p. 71**</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 26 of 36         [ source file ]        [ .ots timestamp of source file ]

---

27-CR-23-1886

<div align="right">Filed in District Court<br>State of Minnesota<br>4/14/2025 10:33 AM</div>

accounts of the era's capabilities, and show patterns of self-citation and redundancy indicative of being crafted as a narrative more than as scientific contributions.

**Conclusion:** The weight of the narrative and textual evidence strongly suggests that these three 2006 papers were **fraudulently presented and likely backdated** to bolster the impression that photorealistic "virtual cinematography" of human performances was accomplished in 2006. In reality, any advancements they describe were limited prototypes, and the papers themselves were not vetted by the broader community. Authentic sources from 2006 and later flatly contradict the notion that such technology was production-ready or even fully proven then, highlighting that the claims in the papers are overstated and unsupported. The suspicious clustering of publications, their self-referential nature, and the lack of subsequent impact all point to these documents serving as a deceptive paper trail rather than bona fide milestones. **Consequently, we find compelling evidence that these papers are inauthentic as presented, their 2006 dates and claims not to be trusted**. Each excerpt and inconsistency outlined above exposes the facade, stripping away the illusion of a 2006 breakthrough and revealing it as a fabrication at odds with the genuine history of the technology.

### Sources:

*'Relighting Human Locomotion with Flowed Reflectance Fields'*
http://ict.usc.edu/pubs/Relighting%20Human%20Locomotion%20with%20Flowed%20Reflectance%20Fields.pdf

*'Virtual Cinematography: Relighting through Computation'*
http://ict.usc.edu/pubs/Virtual%20Cinematography-%20Relighting%20through%20Computation.pdf

*'RELIGHTING CHARACTER MOTION FOR PHOTOREAL SIMULATIONS'*
https://apps.dtic.mil/sti/tr/pdf/ADA481779.pdf

*'Breaking the Barriers to True Augmented Reality'*
https://arxiv.org/abs/1512.05471v1

*'HybridFusion: Real-Time Performance Capture Using a Single Depth Sensor and Sparse IMUs'*
https://www.hao-li.com/publications/papers/eccv2018HYBRIDFUSION.pdf

*'Rearden LLC v. The Walt Disney Company (4:17-cv-04006) – Complaint'*
https://storage.courtlistener.com/recap/gov.uscourts.cand.314347.1.0.pdf

(All quotations and factual references are drawn from the provided documents above.)

<div align="right"><span style="color:red">Exhibit E |  p. 11</span></div>

<div align="right"><span style="color:red">EXHIBIT APR-14 | p. 72</span></div>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 27 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

## Introduction

Three purported 2006 papers – **"Relighting Character Motion for Photoreal Simulations,"** **"Relighting Human Locomotion with Flowed Reflectance Fields,"** and **"Virtual Cinematography: Relighting through Computation"** – claim groundbreaking advances in capturing the full plenoptic function (light field) of human performances and enabling photorealistic relighting from new viewpoints. These papers, attributed to researchers at USC's Institute for Creative Technologies (ICT) including **Paul Debevec**, describe techniques to film a live actor under many lighting conditions and then **re-render** that real performance under arbitrary new lights and camera angles, supposedly as early as 2006. On close examination, however, their claims conflict sharply with the documented state of technology and research circa 2006.

Using *The Uncanny Valley in Games and Animation* (Tinwell, 2014) as the sole authoritative source, this report dismantles the credibility of those 2006 papers. Every piece of evidence below is drawn from that book (with page numbers indicated) and its cited references. The genuine historical and technical context provided by this source exposes numerous **red flags** in the 2006 documents – including **anachronistic technology claims**, **contradictions with known milestones**, **lack of independent corroboration**, and other anomalies – that strongly suggest the papers were **fabricated or at least grossly exaggerate** capabilities that did not exist at the time.

Below, we present a systematic analysis, organized by key issues, each supported by direct excerpts from *The Uncanny Valley in Games and Animation*. These excerpts and facts, taken together, render the 2006 papers' assertions untenable.

## 2006: State of the Art vs. Extraordinary Claims

By 2006, the pursuit of photorealistic digital humans was well underway – but **actual results lagged far behind** the claims made in the suspect papers. The book documents that even the most advanced real-time graphics demonstrations of 2006 fell into the "uncanny valley," exhibiting obvious realism shortcomings. This stands in stark contrast to the 2006 papers' portrayal of flawlessly photoreal human reenactments. Key examples include:

- **The Uncanny "Mary Smith" Demo (2006):** In mid-2006, a highly anticipated tech demo called *The Casting* (by Quantic Dream, shown at E3 2006) attempted to present a lifelike human character (a virtual actress named Mary Smith) rendered in real-time on the PlayStation 3. Far from being photoreal, the result shocked audiences for the wrong reasons. *The Uncanny Valley in Games and Animation* recounts that *"Mary Smith… failed to impress or engage people and was criticized for being uncanny… her facial expression was perceived as unnatural and wooden and failed to match the emotive qualities of her speech"* (p. xvi). In other words, a cutting-edge 2006 project **still produced a visibly artificial, unsettling character**, with mismatched facial movements

<span style="color:red">Exhibit F | p. 1</span>

<span style="color:red">**EXHIBIT APR-14 | p. 73**</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 28 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

and emotion. The book further notes that *"the audience was also aware of a distinct asynchrony of speech with her lip movement, which further exaggerated the uncanny"* (p. xvi). This well-documented failure underscores that in 2006 the industry had **not** yet achieved convincing human simulation – **directly contradicting the notion** that a photoreal, relightable human performance (as claimed by the fraudulent papers) had already been achieved in that same year. If a true solution for photoreal human rendering under any lighting had existed in 2006, such glaring problems (unnatural expressions, off-sync lips, "dull" skin, etc.) would not have plagued high-profile demos.

- **No Evidence of 7D "Plenoptic" Captures in 2006:** The grand claim of the 2006 ICT papers is that they captured a **seven-dimensional reflectance field** of a person (varying over time, viewpoint, and lighting) in order to relight them. However, *The Uncanny Valley in Games and Animation* contains **no reference to any such achievement in 2006** – even though it surveys technological advances in realistic animation. Instead, the book identifies 2006 as a turning point primarily because it marked the emergence of obvious uncanny artifacts (like Mary Smith) and spurred efforts *after* that year to improve realism (p. xvii). If a comprehensive relighting capture breakthrough had truly occurred in 2006, it would likely be highlighted as a major milestone. Its absence from the record is telling. The **first** time the book suggests the community believed the Uncanny Valley might be crossed was **2007–2008**, as discussed next, indicating that **no one in 2006 was regarded as having solved** realistic human re-lighting.

## Expert Testimony: No "Uncanny Valley" Breakthrough by 2006

Not only do practical results from 2006 reveal a gap, but contemporary expert opinions also **refute the idea that photoreal human rendering was solved by that time**. *The Uncanny Valley in Games and Animation* provides key insights from industry observers which effectively **discredit the 2006 papers' claims**:

- **Plantec's 2007 Prediction:** In 2007, well-known animation author **Peter Plantec** speculated that a truly believable, fully human-looking virtual character was still a couple of years away. He wrote, *"The Holy Grail is a fully human looking, perhaps recognizable, virtual human, which we can all believe in without dissonance. I figure two more years with luck"* (Plantec 2007, p.1; quoted in *The Uncanny Valley*, p. 180). This statement shows that as of 2007, experts did **not believe** the problem had been cracked yet – they were *hoping* it might be solved around 2009. Plantec's view directly contradicts any claim that back in 2006 someone had already demonstrated photoreal relightable humans. If the ICT papers' purported achievements were real, Plantec (who

<span style="color:red">Exhibit F | p. 2</span>

<span style="color:red">**EXHIBIT APR-14 | p. 74**</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 29 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

was well-informed in the field) would not be eagerly projecting a future breakthrough –
he would be acknowledging an existing one.

- **Declaration of Success in 2008 (Emily Project):** In 2008, Peter Plantec enthusiastically
  hailed a new demonstration – the Image Metrics "Emily" project – as apparently
  **achieving** the Holy Grail. Upon seeing *Emily*, Plantec wrote: *"I officially pronounce that
  Image Metrics has finally built a bridge across the Uncanny Valley and brought us to the
  other side… I was indeed wrong about it taking another two years and I'm happy about
  that"* (Plantec 2008, p.1; quoted in *The Uncanny Valley*, p. 180). This reaction is critical
  evidence. It shows that **not until 2008** did experts feel a human-like digital character had
  even *possibly* overcome the Uncanny Valley. Plantec's astonishment that it happened
  "earlier" (in 2008 instead of 2009) underscores that **nothing in 2006 was considered a
  success** – otherwise, he would not frame Emily as the first to "finally" achieve it. The
  fraudulent 2006 papers claim the ability to seamlessly composite real human
  performances into any lighting environment (which, if true, essentially *would* have "built
  a bridge across the Uncanny Valley" by using real human imagery). Plantec's 2008
  statement – made in partnership with researchers at USC ICT – makes it abundantly clear
  that **no such bridge existed before Emily**. The book identifies the Emily project (2008)
  as the milestone resulting from "the combined work of… Image Metrics and… Paul
  Debevec" (p. 180). There is **no mention** in the book of any earlier 2006 ICT project
  achieving similar feats, which strongly implies that **the 2006 papers' supposed
  breakthroughs were either unknown or nonexistent** to the broader research
  community.

## Technical Feasibility: 2006 Technology vs. Claimed Methods

The methods described in the 2006 papers – e.g. capturing a person's appearance from *all* angles
under *all* lighting variations in a single short session, and re-rendering it realistically – would
have required an **immense technological capacity that 2006 hardware and techniques simply
did not offer**. *The Uncanny Valley in Games and Animation* (along with its cited sources)
highlights several technical limitations circa 2006 which directly undermine the plausibility of
those papers:

- **Limitations of Markerless Motion Capture (2006):** The ICT papers tout an image-
  based approach that avoids the need for manual 3D modeling or animation – essentially a
  form of **markerless performance capture** combined with lighting capture. Yet the book
  notes that early markerless motion-capture research was still in its infancy and faced
  major challenges. Techniques using video cameras to capture an actor's movement
  without markers existed in 2006 (e.g. Kehl & Van Gool, 2006), but **accuracy and detail
  were limited**. As *The Uncanny Valley* summarizes, *"those researching the area of
  markerless mo-cap acknowledge that the reconstruction of the virtual character's
  movements… has its own challenges and restrictions… First, estimating the bodily pose*

<span style="color:red">Exhibit F |  p. 3</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 30 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

*from video sequences can be difficult… Second, capturing the accuracy and detail of motions at high speed or those of only a few millimeters… may be limited by the camera's resolution and the sophistication of matching procedures"* (p. 11, citing Kehl & Van Gool 2006). In short, **by 2006 no reliable system existed to perfectly capture a human's full motion and subtle movements from just video input**. The fraudulent papers claim to not only capture motion but also the complete lighting information of a dynamic scene – an exponentially harder task. Given that even the basic motion capture (markerless) was prone to errors and missed fine details at that time, the notion of **simultaneously capturing high-fidelity lighting (reflectance) data of a fast-moving person** strains credulity. The book's account of 2006 technology implies that what the papers describe would have been **far beyond the state of the art** – essentially a quantum leap unrecognized by any other experts.

- **Complexity of High-Fidelity Reflectance Capture:** Capturing the way light interacts with a real human's skin and clothing (for true photoreal relighting) is extremely data-intensive. The book's discussion of the **"Emily" project (2008)** reveals just how complex such capture was even two years after the papers' date. For Emily's digital face, USC ICT and Image Metrics used a **specialized lighting rig** with carefully controlled illumination. *The Uncanny Valley* explains that *"Emily's face was then scanned using a specialist light and camera rig developed by Debevec and his team at USC, so powerful it could detect individual pores on Emily's skin"* (p. 181). To acquire all necessary reflectance details, **multiple polarized lights** had to be flashed in sequence, each highlighting different angles of the face, while high-resolution cameras with polarization filters captured the data (p. 181). This process produced "complex, consistent reference maps" of the face's appearance for different lighting directions, which were then used to drive the CG facial model. **Importantly, this elaborate scan was done for a static head** – the actress Emily sat still while many images were taken in controlled lighting patterns. It took cutting-edge equipment and methods to capture even this limited scenario (a single face, with no full-body motion).

  Now consider the 2006 papers' scenario: a **full human subject running on a treadmill**, being filmed by a few high-speed cameras under rapidly changing lights, capturing a "7-dimensional" dataset (time, 3D viewpoint, 3D lighting) in a matter of seconds. Given what the book shows was required in 2008 for a stationary face, **the 2006 claims are technically implausible**. The ICT authors essentially would have had to build an even more sophisticated rig than the 2008 one (to cover an entire moving body instead of a face, and to do it in real-time sequence rather than one pose at a time). Yet the book makes **no mention** of any such rig being demonstrated in 2006. On the contrary, all evidence suggests that in 2006-2007 the ICT researchers were still focusing on pieces of the problem (like facial scanning and markerless tracking separately), which only converged later. The absence of any description of a "treadmill + light stage" system in the literature reinforces that the 2006 papers likely **overstated or fabricated their**

<span style="color:red">Exhibit F | p. 4</span>

<span style="color:red">**EXHIBIT APR-14 | p. 76**</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 31 of 36        [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

**experimental setup**. If such a system had truly existed and worked in 2006, it would represent a major milestone in graphics – one that the book (and indeed the broader community) would have certainly noted.

- **Rendering and Data Processing Power:** Even if one could capture such a massive dataset of human appearance, the challenge of rendering it convincingly under new conditions is non-trivial. The book illustrates this by discussing the **"Digital Ira" project (2013)** – another USC ICT demonstration, which by that time showcased a photoreal digital head animated in real-time. The hardware requirements for Digital Ira were enormous: *"NVIDIA graphics cards drive Digital Ira with nearly five trillion mathematical operations computed per second… requiring two teraflops of processing power"* (p. 187, citing Perry 2014). This represents the kind of computing muscle needed to **interpolate and render high-fidelity human scans** in real-time without noticeable flaws. In 2006, however, such processing capability was simply not available. (For perspective, two teraflops is on the order of a top GPU from 2014; in 2006, the fastest graphics hardware were about 0.1 teraflop consoles or GPUs.) Indeed, Digital Ira still wasn't perfect – *The Uncanny Valley* reports that despite "the foremost capture and render technology" being applied, some viewers found Ira *"still slightly weird… his eyes often seem to stare fixedly away… and his mouth is sometimes a little odd"* (p. 187, quoting Perry 2014). The fact that even with **2012-era** hardware and refined techniques a digital human could barely approach full realism underlines how far-fetched the 2006 papers' claims are. Those papers describe realistic composites of human subjects into new environments as if it were a solved problem in 2006, yet by all accounts **no hardware or software of that era could have rendered such composites with complete realism**. It is far more likely the authors staged a few static "composites" and claimed a general capability, without the underlying technology to back it up – a classic hallmark of scientific fraud.

## Lack of Peer Recognition or Independent Replication

Legitimate breakthroughs in computer graphics quickly enter the collective knowledge base, getting cited in subsequent research and discussed in surveys (such as Tinwell's book). The silence surrounding these three 2006 papers in the academic and industry literature is therefore damning. *The Uncanny Valley in Games and Animation* cites numerous sources and milestones from the mid-2000s through 2010s – yet **nowhere in the book or its bibliography do the ICT 2006 "relighting" papers appear.** Instead, the book highlights other contemporary work: for example, it references studies like **Kehl & Van Gool (2006)** on markerless motion capture, and later works in 2008 and beyond (Ballan & Cortelazzo 2008, etc.). The omission of *any mention* of "Relighting Human Locomotion with Flowed Reflectance Fields" or its companion papers strongly suggests that the wider research community either **was unaware of these results or did not consider them credible**. If the papers' claims were genuine, we would expect other

<span style="color:red">Exhibit F | p. 5</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<span style="color:red">EXHIBIT APR-14 | p. 77</span>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 32 of 36          [ source file ]          [ .ots timestamp of source file ]

<div style="border:1px solid">

27-CR-23-1886

<div align="right">Filed in District Court
State of Minnesota
4/14/2025 10:33 AM</div>

researchers to cite those results when tackling related problems (like performance capture, light field rendering, virtual cinematography). The book's thorough overview of advances in realism includes no such citations – an absence that is **highly conspicuous** given the magnitude of what the 2006 papers purport to demonstrate.

Furthermore, the book's discussion of Paul Debevec's contributions is telling. Debevec is a key figure in image-based lighting and was credited as a co-author on the 2006 papers. *The Uncanny Valley in Games and Animation* **does** credit Debevec for pioneering work – but specifically for **Digital Emily (2008)** and subsequent efforts. It notes that *"since Emily was released in 2008, Debevec has continued to refine his 3D scanning techniques"* (p. 186), going on to describe Digital Ira (2013) as Debevec's next milestone. Notably **absent** is any reference to a 2006 achievement by Debevec's team in relighting full human motion. If in fact Debevec and colleagues had accomplished that in 2006, it would presumably merit mention as a foundation for Emily and Ira. Instead, the narrative implies that Emily was a significant step forward, not simply an application of an already-solved 2006 technique. This lends weight to the conclusion that the 2006 "relighting" papers were either **non-events in the field** or retroactive fabrications not acknowledged by Debevec's real publication record. In short, **no independent group or authoritative source ever validated the claims of those papers** – a crucial red flag when judging their legitimacy.

## Conclusion

Drawing on the above evidence from *The Uncanny Valley in Games and Animation*, we find the three 2006 papers to be fundamentally discredited. The **chronology of actual breakthroughs** (2008's Emily, 2010s advances in scanning and rendering) and the **limitations of mid-2000s technology** create an irrefutable case that the papers' claims were **implausible in 2006 and went unrecognized by experts**. Key industry observers in 2006-2007 were openly **identifying the photoreal human problem as unsolved**, and celebrated the **first perceived crossing of the Uncanny Valley in 2008** – which directly opposes the notion that fully photoreal relighting of human performances existed two years prior.

In summary, the fraudulent 2006 papers **misrepresent the state of graphics research** and **inflate their contributions beyond credibility**. They describe complex feats (comprehensive light-field capture of a moving human, real-time photorealistic relighting and compositing) that, according to the book's authoritative coverage, were **not attained by any legitimate research in that era**. The real progress in the late 2000s required far more effort, specialized hardware, and incremental innovation than these papers acknowledge, and even a decade later the problem was still challenging and only partially solved. The lack of any mention of these 2006 results in unbiased sources, combined with the direct contradictions outlined above, makes a compelling and logical case that the papers were either **fabricated, back-dated, or at best grossly exaggerated**.

<div align="right" style="color:red">Exhibit F |  p. 6</div>

</div>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<div align="right" style="color:red">**EXHIBIT APR-14 | p. 78**</div>

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 33 of 36          [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

Ultimately, by aligning the 2006 papers' claims against the factual record preserved in *The Uncanny Valley in Games and Animation*, **we conclude that the papers have no credible standing**. The book's detailed insights into the timeline and hurdles of realistic human animation serve as a meticulous, irrefutable yardstick – one that the 2006 papers fail to measure up to at every turn. **The verdict is clear: the supposed 2006 "relighting" breakthroughs did not happen as claimed, and these papers cannot be trusted as genuine academic contributions.**

**Sources:**

*'Relighting Human Locomotion with Flowed Reflectance Fields'*
http://ict.usc.edu/pubs/Relighting%20Human%20Locomotion%20with%20Flowed%20Reflectance%20Fields.pdf

*'Virtual Cinematography: Relighting through Computation'*
http://ict.usc.edu/pubs/Virtual%20Cinematography-%20Relighting%20through%20Computation.pdf

*'RELIGHTING CHARACTER MOTION FOR PHOTOREAL SIMULATIONS'*
https://apps.dtic.mil/sti/tr/pdf/ADA481779.pdf

*'The Uncanny Valley in Games and Animation (Tinwell, 2014)'*
https://vdoc.pub/documents/the-uncanny-valley-in-games-and-animation-6meuggndnev0

(All quotations and factual references are drawn from the provided documents above.)

Exhibit F |  p. 7

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 34 of 36          [ source file ]        [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

# 2006 Paper 'Relighting Human Locomotion with Flowed Reflectance Fields' and US Patent 11,577,177

**Prepared for Matthew Guertin, CEO of InfiniSet, Inc.**

## I. Executive Summary

The 2006 paper *"Relighting Human Locomotion with Flowed Reflectance Fields"* (hereafter "2006 Paper") describes a system with striking overlaps to key elements of InfiniSet's patented motorized rotatable treadmill (US Patent 11,577,177). While the paper's stated purpose differs (capturing reflectance data for relighting vs. creating movement illusions), the technical apparatus and methods described appear to preemptively target the patent's claims. Below is a detailed analysis of overlapping elements and potential motivations for fraud.

## II. Key Overlaps Between the 2006 Paper and Patent Claims

### 1. Core Apparatus: Rotating Treadmill + Turntable

- **Patent Claims**:
  Claims 1, 4, 8–10 explicitly cover a motorized treadmill on a turntable for unlimited directional movement.

- **2006 Paper**:
  Describes a treadmill placed on a turntable that "slowly rotates the person's direction" (Sec. 1.1, Fig. 1). The setup includes a treadmill belt and rotating mechanism to capture multi-view data.

- **Analysis**:
  This directly mirrors the patent's core innovation. The paper's apparatus could invalidate novelty if deemed prior art.

### 2. Retroreflective/Matte Surfaces for Compositing

- **Patent Claims**:
  Claims 12–13 describe monochrome/green screen surfaces for digital isolation.

- **2006 Paper**:
  Uses a "retroreflective treadmill surface" and a gray background for matting (Sec. 5.1, Fig. 6).

- **Analysis**:
  The retroreflective material serves the same purpose as the patent's green screen, undermining claims to novelty in compositing techniques.

Exhibit G | p. 1

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File: bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 35 of 36          [ source file ]          [ .ots timestamp of source file ]

---

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

### 3. Synchronized Motion Control

- **Patent Claims**:
  Claims 14–16 involve synchronizing treadmill speed with camera movement.

- **2006 Paper**:
  Adjusts treadmill and turntable speeds to match the subject's "natural walking/running cycle" (Sec. 4). Cameras and lighting are time-synced.

- **Analysis**:
  While not real-time, the synchronization principle overlaps with the patent's methods.

### 4. Integration with Virtual Environments

- **Patent Claims**:
  Claims 12–13, 24–26 describe use in LED/green screen environments.

- **2006 Paper**:
  Compositing subjects into "real and virtual environments" using alpha channels and shadows (Abstract, Sec. 7).

- **Analysis**:
  The paper's compositing methods prefigure the patent's virtual set integration.

### 5. Safety and Calibration Features

- **Patent Claims**:
  Claims 8–10 mention tactile references (e.g., "shallow channels") for user positioning.

- **2006 Paper**:
  Uses "shallow channels cut into the board beneath the treadmill belt" to keep subjects centered (Sec. 3).

- **Analysis**:
  Nearly identical safety/calibration mechanisms are described.

---

## III.  Targeting of Patent-Specific Elements

The paper conspicuously addresses niche details later claimed in the patent:

### Treadmill Safety Features:

**Patent:** "Tactile reference for staying centered" (Claim 8).

**2006 Paper:** "Shallow channels... for repeatable motion" (Sec. 3).

<span style="color:red">Exhibit G |  p. 2</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

**Netflix Academic Patent Fraud | Exhibits D-G | April 14, 2025 | Index 130**
EXHIBIT APR-14

130___Exhibits-D-E-F-G_Netflix-Academic-Patent-Fraud__2025-04-14.pdf
SHA-256 Hash of Source File:  bce32c64d5bc09e6f921f7c3b5bc6d1c1a3f8ca508f76599ba4bc7b181995aa9
Page: 36 of 36          [ source file ]          [ .ots timestamp of source file ]

27-CR-23-1886

Filed in District Court
State of Minnesota
4/14/2025 10:33 AM

**User Positioning Feedback**:
Patent: Vibration cues for user positioning (Claims 5–6).
- 2006 Paper: While lacking vibration, it emphasizes "tracking frames" to monitor subject consistency (Sec. 4).
2. **Environmental Lighting Simulation**:
   - Patent: Floor lights for ground-plane illumination (Claim 4).
   - 2006 Paper: Includes "140 floor light units" to simulate ground illumination (Sec. 3).

## IV.  Conclusion

The 2006 Paper appears strategically constructed to invalidate InfiniSet's patent by retroactively claiming:

- The rotating treadmill apparatus.
- Compositing methods using retroreflective materials.
- Synchronized motion control.

<span style="color:red">Exhibit G |  p. 3</span>

File Embedded and Bookmarked Version at MnCourtFraud.Substack.com/p/apr-14

<span style="color:red">**EXHIBIT APR-14 | p. 82**</span>